# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Jody E. Ratcliff, | : Civil Action No.: |
| | : |
| Plaintiff, | : |
| | : |
| vs. | : JURY TRIAL DEMANDED |
| | : |
| American Honda Motor Co. Inc.; | : |
| Auto Generator & Starter Service Inc.; | : |
| Avon Products Inc.; | : |
| Barnes Motor & Parts Co. Inc. (f/k/a Barnes | : |
| Motor Co.); | : |
| BMW of North America LLC; | : |
| Bobbi Brown Professional Cosmetics Inc.; | : |
| BorgWarner Morse TEC LLC; | : |
| Brenntag Specialties Inc. (f/k/a Mineral and | : |
| Pigment Solutions Inc. and Whittaker, Clark & | : |
| Daniels Inc.); | : |
| British American Tobacco PLC (d/b/a Yardley | : |
| and as successor to Yardley & Co. Ltd.); | : |
| Britain's Garage LLC: | : |
| Clinique Laboratories LLC; | : |
| Colgate-Palmolive Co.; | : |
| ConAgra Brands Inc. (f/k/a ConAgra Foods Inc., | : |
| individually and as successor to Beatrice | : |
| Foods Co.; Esmark Inc.; and International | : |
| Playtex Inc.); | : |
| Continental Automotive Systems Inc. (f/k/a | : |
| Continental Teves Inc.); | : |
| Cyprus Amax Minerals Co.; | : |
| Dan Wise Chevrolet Inc.; | : |
| Dana Companies LLC; | : |
| Doug Henry Chevrolet Buick GMC Inc. (f/k/a | : |
| Doug Henry Chevrolet Buick Pontiac GMC | : |
| Truck Inc. and Doug Henry Chevrolet Buick | : |
| Pontiac GMC Inc.); | : |
| Doug Henry Chevrolet Inc. (f/k/a Doug Henry | : |
| Chevrolet Oldsmobile Inc.); | : |
| | : |

1

Edgewell Personal Care Co. (individually and as    :
     successor to Playtex Products Inc., f/k/a    :
     Playtex FP Group Inc., individually and as    :
     successor to Playtex Family Products Corp.    :
     and Playtex Holdings Inc.);    :
Edgewell Personal Care LLC (f/k/a Energizer    :
     Personal Care LLC, individually and as    :
     successor to Playtex Products Inc., f/k/a    :
     Playtex FP Group Inc., individually and as    :
     successor to Playtex Family Products Corp.    :
     and Playtex Holdings Inc.);    :
Estée Lauder Inc.;    :
Frema Motors Inc.;    :
Ford Motor Co.;    :
Gene Taylor Inc. (f/k/a Gene Taylor Chevrolet    :
     Inc. and Gene Taylor Chevrolet-GMC Inc.);    :
Genuine Parts Co.;    :
Hennessy Industries Inc.;    :
Honeywell International Inc. (f/k/a Allied Signal    :
     Inc., as successor to the Bendix Corp.);    :
Imerys Talc America Inc. (f/k/a Luzenac America    :
     Inc.);    :
L'Oreal SA (individually and as successor to The    :
     Maybelline Co. and Maybelline Inc.);    :
L'Oreal USA Creative Inc. (d/b/a Maybelline and    :
     f/k/a Maybelline Cosmetics Corp., individually    :
     and as successor to The Maybelline Co. and    :
     Maybelline Inc.);    :
L'Oreal USA Inc. (f/k/a Cosmair Inc.);    :
Maremont Corp.;    :
Massey Motor Co.;    :
Maybelline LLC;    :
Mitsubishi Motors North America Inc.;    :
National Automotive Parts Association Inc.;    :
Navistar Inc. (f/k/a International Truck and    :
     Engine Corp.);    :
Nissan North America Inc.;    :
Paul Benton Motors of North Carolina LLC    :
     (individually and as successor to Gene Taylor    :
     Inc.; Gene Taylor Chevrolet Inc.; and Gene    :
     Taylor Chevrolet-GMC Inc.);    :
   :

2

Personal Care Products Council (f/k/a Cosmetics,    :
    Toiletries, and Fragrance Association);    :
Playtex Products LLC (individually and as    :
    successor to Playtex Products Inc., f/k/a    :
    Playtex FP Group Inc., individually and as    :
    successor to Playtex Family Products Corp.    :
    and Playtex Holdings Inc.);    :
R&S Automotive;    :
R&S Automotive Service LLC;    :
Revlon Inc.;    :
Revlon Consumer Products Corp.;    :
Sale Auto Mall Inc. (f/k/a Sale Chevrolet, Buick,    :
    BMW Inc. and Sale Chevrolet-BMW Inc., and    :
    as successor to Poole Buick Co. Inc.);    :
Sale Automotive Group Inc.;    :
Sale Ford LLC;    :
Standard Motor Products Inc.;    :
Tampbrands Inc.;    :
Target Corp.;    :
Tilghman's Garage LLC;    :
The Estée Lauder Companies Inc.;    :
The Gillette Co.;    :
The Procter & Gamble Co. (individually and as    :
    successor to Yardley of London and The    :
    Gillette Co.);    :
Toyota Motor Sales USA Inc.;    :
Walgreen Co.;    :
White Owl Parts Co. Inc.    :
Whittaker, Clark & Daniels Inc.;    :
Winner Chevrolet Inc.;
Wynn Odom Ford Inc.,

      Defendants.

## <u>CIVIL ACTION COMPLAINT</u>

    Plaintiff, Jody E. Ratcliff, by and through her attorneys, Wallace & Graham P.A.,

hereby brings this Civil Action Complaint, and says:

## JURISDICTION AND VENUE

1.     Pursuant to 28 U.S.C. § 1332(a), this Court has original jurisdiction in this action because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties are citizens of different states.

2.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in North Carolina, the Plaintiff incurred relevant exposure to harmful asbestos fibers in this district, and/or one or more of the local Defendants are located or do business in this district.

3.     As to the resident Defendants[1], this Court has personal jurisdiction pursuant to N.C. Gen. Stat. § 1-75.4(1) and principles of minimum contacts and due process.

4.     As to the non-resident Defendants[2], this Court has personal jurisdiction pursuant to N.C. Gen. Stat. §§ 1-75.4(1)(d); 1-75.4(3); and 1-75.4(4) and principles of minimum contacts and due process.

---

[1] Auto Generator & Starter Service Inc.; Barnes Motor & Parts Co. Inc.; Britain's Garage LLC; Dan Wise Chevrolet Inc.; Doug Henry Chevrolet Buick GMC Inc.; Doug Henry Chevrolet Inc.; Frema Motors Inc.; Gene Taylor Inc.; Massey Motor Co.; Paul Benton Motors of North Carolina LLC; R&S Automotive; R&S Automotive Services LLC; Sale Auto Mall Inc.; Sale Automotive Group Inc.; Sale Ford LLC; Tilghman's Garage LLC; White Owl Parts Co. Inc.; Winner Chevrolet Inc.; and Wynn Odom Ford Inc.

[2] American Honda Motor Co. Inc.; Avon Products Inc.; BMW of North America LLC; Bobbi Brown Professional Cosmetics Inc.; BorgWarner Morse TEC LLC; Brenntag Specialties Inc.; British American Tobacco PLC; Clinique Laboratories LLC; Colgate-Palmolive Co.; ConAgra Brands Inc.; Continental Automotive Systems Inc.; Cyprus Amax Minerals Co.; Dana Companies LLC; Edgewell Personal Care Co.; Edgewell Personal Care LLC; Estée Lauder Inc.; Ford Motor Co.; Genuine Parts Co.; Hennessy Industries Inc.; Honeywell International Inc.; Imerys Talc America Inc.; L'Oreal SA; L'Oreal USA Creative Inc.; L'Oreal USA Inc.; Maremont Corp.; Maybelline LLC; Mitsubishi Motors North America Inc.; National Automotive Parts Association Inc.; Navistar Inc.; Nissan North America Inc.; Personal Care Products Council; Playtex Products LLC; Revlon Inc.;

4

5.      As to Defendant Personal Care Products Council, in addition to the bases above regarding non-resident Defendants, this Court also has personal jurisdiction because, as further detailed herein, Defendant Personal Care Products Council participated in a conspiracy with one or more co-conspirator Defendants over which this Court has personal jurisdiction based, in whole or in part, on said co-conspirators' contacts with North Carolina.[3]

6.      On information and belief, the Defendants may be served with process via the mailing addresses attached hereto and entitled, "Service List."

## PARTIES

7.      Plaintiff, Jody E. Ratcliff (hereinafter "Ms. Ratcliff" or "Plaintiff"), is a natural person and a resident of Seattle, Washington State.

8.      Plaintiff brings this action for monetary damages resulting from her exposure to asbestos[4] and consequent diagnosis of malignant mesothelioma on or about March 6, 2014. The Plaintiff previously during pertinent times resided in North Carolina, and suffered relevant asbestos exposure in locations in North Carolina including but not limited to in the Durham, North Carolina region.

---

Revlon Consumer Products Corp.; Standard Motor Products Inc.; Tampbrands Inc.; Target Corp.; The Estée Lauder Companies Inc.; The Gillette Co.; The Procter & Gamble Co.; Toyota Motor Sales USA Inc.; and Whittaker, Clark & Daniels Inc.
[3] *See, e.g., BeoCare Group Inc. v. Morrissey*, 124 F.Supp.3d 696, 701-02 (W.D.N.C. Aug. 19, 2015) (quoting *Unspam Techs. Inc. v. Chernuck*, 716 F.3d 322, 329 (4th Cir. 2013)); *Griffith v. Gray*, 2017 WL 388858 (W.D.N.C. Jan. 9, 2017) (citing *Unspam*, 716 F.3d at 329).
[4] The "term" asbestos, as used herein, shall be interpreted in the broadest sense and include non-regulated and non-commercial forms of asbestos, cleavage fragments, and transition/transitional fibers, without specific limitation as to fiber size, dimension or ratio.

9.    All of the Friction Defendants[5] are foreign corporations amenable to personal jurisdiction in North Carolina pursuant to N.C. Gen. Stat. §§ 1-75.4(1)(d), 1-75.4(3) and/or 1-75.4(4). Each Friction Defendant mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce automotive products, materials and/or equipment containing asbestos to which Plaintiff was directly and indirectly exposed in North Carolina between 1985 and approximately 2004.

10.    All of the Talc Defendants[6] are foreign corporations amenable to personal jurisdiction in North Carolina pursuant to N.C. Gen. Stat. §§ 1-75.4(1)(d), 1-75.4(3) and 1-75.4(4). Each Talc Defendant mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold and/or otherwise placed in the

---

[5] "Friction Defendants" include American Honda Motor Co. Inc.; Auto Generator & Starter Service Inc.; Barnes Motor & Parts Co. Inc.; BMW of North America LLC; BorgWarner Morse TEC LLC; Britain's Garage LLC; Continental Automotive Systems Inc.; Dan Wise Chevrolet Inc.; Dana Companies LLC; Doug Henry Chevrolet Buick GMC Inc.; Doug Henry Chevrolet Inc.; Frema Motors Inc.; Ford Motor Co.; Gene Taylor Inc.; Genuine Parts Co.; Honeywell International Inc.; Maremont Corp.; Massey Motor Co.; Mitsubishi Motors North America Inc.; National Automotive Parts Association Inc.; Navistar Inc.; Nissan North America Inc.; Paul Benton Motors of North Carolina LLC; R&S Automotive; R&S Automotive Service LLC; Sale Automotive Group Inc.; Sale Auto Mall Inc.; Sale Ford LLC; Standard Motor Products Inc.; Tilghman's Garage LLC; Toyota Motor Sales USA Inc.; White Owl Parts Co. Inc.; Winner Chevrolet Inc.; and Wynn Odom Ford Inc.
[6] "Talc Defendants" include Avon Products Inc.; Bobbi Brown Professional Cosmetics Inc.; Brenntag Specialties Inc.; British American Tobacco PLC; Clinique Laboratories LLC; Colgate-Palmolive Co.; ConAgra Brands Inc.; Cyprus Amax Minerals Co.; Edgewell Personal Care Co.; Edgewell Personal Care LLC; Estée Lauder Inc.; Imerys Talc America Inc.; L'Oreal SA; L'Oreal USA Creative Inc.; L'Oreal USA Inc.; Maybelline LLC; Playtex Products LLC; Revlon Inc.; Revlon Consumer Products Corp.; Tampbrands Inc.; Target Corp.; The Estée Lauder Companies Inc.; The Gillette Co.; The Procter & Gamble Co.; Walgreen Co.; and Whittaker, Clark & Daniels Inc.

6

stream of commerce asbestos-containing talc, cosmetic and/or personal hygiene products—including raw and processed talc, makeups, deodorants and/or tampons—that contained asbestos to which Plaintiff was directly and indirectly exposed in North Carolina and elsewhere between approximately February 14, 1977, and 2016.

11.     All of the Retailer Defendants[7] are domestic or foreign corporations amenable to personal jurisdiction in North Carolina pursuant to N.C. Gen. Stat. §§ 1-75.4(1), 1-75.4(1)(d), 1-75.4(3) and/or 1-75.4(4). Retailer Defendants marketed, advertised, supplied, distributed, sold, recommended, applied, installed and/or otherwise placed in the stream of commerce products, materials and/or equipment containing asbestos to which Plaintiff was directly and indirectly exposed, including in North Carolina. Each of the Retailer Defendants had a reasonable opportunity to inspect said asbestos products, materials and/or equipment in such a manner that would have, or in the exercise of reasonable care, should have revealed the existence or presence of asbestos. Additionally, Retailer Defendants marketed, supplied, distributed, sold, installed and/or otherwise placed in the stream of commerce products, materials and/or equipment containing asbestos that were manufactured by one or more entities that are insolvent and/or not subject to the jurisdiction of the courts of North Carolina.

---

[7] "Retailer Defendants" include Auto Generator & Starter Service Inc.; Barnes Motor & Parts Co. Inc.; Britain's Garage LLC; Dan Wise Chevrolet Inc.; Doug Henry Chevrolet Buick GMC Inc.; Doug Henry Chevrolet Inc.; Frema Motors Inc.; Gene Taylor Inc.; Massey Motor Co.; National Automotive Parts Association Inc.; Paul Benton Motors of North Carolina LLC; R&S Automotive; R&S Automotive Service LLC; Sale Automotive Group Inc.; Sale Auto Mall Inc.; Sale Ford LLC; Target Corp.; Tilghman's Garage LLC; Walgreen Co.; White Owl Parts Co. Inc.; Winner Chevrolet Inc.; and Wynn Odom Ford Inc.

12.     All of the Talc Product Retailer Defendants[8] are foreign corporations amenable to personal jurisdiction in North Carolina pursuant to N.C. Gen. Stat. §§ 1-75.4(1)(d), 1-75.4(3) and/or 1-75.4(4). Each Talc Product Retailer Defendant expressly represented to Plaintiff and others similarly situated, by words, actions or otherwise, that the cosmetic and personal hygiene products they marketed, supplied, distributed and sold—including talcum powders, makeups, deodorants and tampons—were safe and healthful for regular use, but said products were not as represented because they contained asbestos and other carcinogens.

13.     All of the Automobile Repair Defendants[9] are domestic corporations amenable to personal jurisdiction pursuant to N.C. Gen. Stat. § 1-75.4(1). Each Automobile Repair Defendant engaged in the business of selling, maintaining and/or repairing vehicles that were composed of various asbestos-containing materials and parts. Each Automobile Repair Defendant owned, leased, possessed or otherwise controlled real property in North Carolina on which said sales, maintenance and/or repair work was performed in the presence of Plaintiff and/or her father between 1985 and approximately 2004.

14.     Defendant American Honda Motor Co. Inc. is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automobiles

---

[8] "Talc Product Retailer Defendants" include Target Corp.; and Walgreen Co.

[9] "Automobile Repair Defendants" include Auto Generator & Starter Service Inc.; Britain's Garage LLC; Dan Wise Chevrolet Inc.; Doug Henry Chevrolet Buick GMC Inc.; Doug Henry Chevrolet Inc.; Frema Motors Inc.; Gene Taylor Inc.; Massey Motor Co.; Paul Benton Motors of North Carolina LLC; R&S Automotive; R&S Automotive Service LLC; Sale Automotive Group Inc.; Sale Auto Mall Inc.; Sale Ford LLC; Tilghman's Garage LLC; White Owl Parts Co. Inc.; Winner Chevrolet Inc.; and Wynn Odom Ford Inc.

8

and automotive parts, including, without limitation, brakes, clutches and gaskets, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

15. Defendant Auto Generator & Starter Service Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

16. Defendant Avon Products Inc. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of makeup and talcum powder products containing asbestos to which Plaintiff was exposed between approximately February 14, 1977, and approximately 1995.

17. Barnes Motor & Parts Co. Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business, as "NAPA Auto Parts," of marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

18. Defendant BMW of North America LLC is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automobiles and automotive parts, including, without limitation, brakes, clutches and gaskets, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

9

19. Defendant Bobbi Brown Professional Cosmetics Inc. is and was a miner, miller, processor, importer, converter, compounder, manufacturer, marketer, supplier, distributor and seller of makeup products containing asbestos to which Plaintiff was exposed between approximately 2006 and approximately 2016.

20. Defendant BorgWarner Morse TEC LLC is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automotive parts, including, without limitation, clutches, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

21. Defendant Brenntag Specialties Inc. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of asbestos-containing talc to which Plaintiff was exposed between approximately February 14, 1977, and approximately 2016.

22. Defendant British American Tobacco PLC is and was a miner, miller, processor, importer, converter, compounder, manufacturer, marketer, supplier, distributor and seller of talcum powder products containing asbestos to which Plaintiff was exposed between approximately February 14, 1977, and approximately 1995.

23. Defendant Britain's Garage LLC is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004

10

24. Defendant Clinique Laboratories LLC is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of makeup products containing asbestos to which Plaintiff was exposed between approximately February 14, 1977, and approximately 2016.

25. Defendant Colgate-Palmolive Co. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of talcum powder products containing asbestos to which Plaintiff was exposed between approximately February 14, 1977, and approximately 1995.

26. Defendant ConAgra Brands Inc. is and was a designer, manufacturer, marketer, supplier, distributor and seller of tampons containing asbestos and other carcinogens to which Plaintiff was exposed between approximately 1990 and approximately 2014.

27. Defendant Continental Automotive Systems Inc. is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automotive parts, including, without limitation, brake assemblies, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

28. Defendant Cyprus Amax Minerals Co. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of asbestos-containing talc to which Plaintiff was exposed between approximately February 14, 1977, and approximately 2016.

29. Defendant Dan Wise Chevrolet Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the

11

business of selling, maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

30.     Defendant Dana Companies LLC is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automotive parts, including, without limitation, clutches and gaskets, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

31.     Defendant Doug Henry Chevrolet Buick GMC Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of selling, maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

32.     Defendant Doug Henry Chevrolet Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of selling, maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

33.     Defendant Edgewell Personal Care Co. is and was a designer, manufacturer, marketer, supplier, distributor and seller of tampons containing asbestos and other carcinogens to which Plaintiff was exposed between approximately 1990 and approximately 2014.

34. Defendant Edgewell Personal Care LLC is and was a designer, manufacturer, marketer, supplier, distributor and seller of tampons containing asbestos and other carcinogens to which Plaintiff was exposed between approximately 1990 and approximately 2014.

35. Defendant Estée Lauder Inc. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of makeup products containing asbestos to which Plaintiff was exposed between approximately February 14, 1977, and approximately 1995.

36. Defendant Frema Motors Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of selling, maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

37. Defendant Ford Motor Co. is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automobiles and automotive parts, including, without limitation, brakes, clutches and gaskets, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

38. Defendant Gene Taylor Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of selling, maintaining and repairing asbestos-containing automobiles and marketing,

supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

39.     Defendant Genuine Parts Co. is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automotive parts, including, without limitation, brakes, clutches and gaskets, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

40.     Defendant Hennessy Industries Inc. ("Hennessy") is a foreign corporation amenable to personal jurisdiction in North Carolina pursuant to N.C. Gen. Stat. §§ 1-75.4(1)(d), 1-75.4(3) and/or 1-75.4(4). Hennessy designed, manufactured, marketed, supplied, distributed, sold and otherwise placed into the stream of commerce automotive brake grinding machines that caused Plaintiff to be exposed to asbestos between approximately 1985 and approximately 2004. It was reasonably foreseeable that said brake grinding machines would be used in conjunction with asbestos brakes, and Hennessy designed and marketed its brake grinders for the sole or primary purpose of grinding brakes.

41.     Defendant Honeywell International Inc. is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automotive parts, including, without limitation, brakes, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

42.     Defendant Imerys Talc America Inc. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and

14

seller of asbestos-containing talc to which Plaintiff was exposed between approximately February 14, 1977, and approximately 2016.

43. Defendant L'Oreal SA is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of makeup products containing asbestos to which Plaintiff was exposed between approximately 1995 and approximately 2016.

44. Defendant L'Oreal USA Creative Inc. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of makeup products containing asbestos to which Plaintiff was exposed between approximately 1995 and approximately 2016.

45. Defendant L'Oreal USA Inc. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of makeup products containing asbestos to which Plaintiff was exposed between approximately 1995 and approximately 2016.

46. Defendant Maremont Corp. is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automotive parts, including, without limitation, brakes and mufflers, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

47. Defendant Massey Motor Co. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of selling, maintaining and repairing asbestos-containing automobiles and marketing,

15

supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

48. Defendant Maybelline LLC is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of makeup products containing asbestos to which Plaintiff was exposed between approximately 1989 and approximately 2016.

49. Defendant Mitsubishi Motors North America Inc. is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automobiles and automotive parts, including, without limitation, brakes, clutches and gaskets, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

50. Defendant National Automotive Parts Association Inc. is and was a supplier, distributor and seller of asbestos-containing automobiles and automotive parts, including, without limitation, brakes, clutches and gaskets, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

51. Defendant Navistar Inc. is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing trucks and truck parts, including, without limitation, brakes, clutches and gaskets, to which Plaintiff was exposed between approximately February 17, 1977, and approximately 1995.

52. Defendant Nissan North America Inc. is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automobiles

16

and automotive parts, including, without limitation, brakes, clutches and gaskets, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

53.     Defendant Paul Benton Motors of North Carolina LLC is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of selling, maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

54.     Defendant Personal Care Products Council (f/k/a Cosmetic, Toiletry, and Fragrance Association) ("PCPC or "CTFA") was and is a trade or industry organization based in Washington, District of Columbia, that has represented and continues to represent— through lobbying efforts and otherwise—the interests of companies, including many of the Talc Defendants and Talc Retailer Defendants herein, that mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce cosmetic and personal hygiene products that contained asbestos and other carcinogens. In addition to the bases above regarding non-resident Defendants, this Court also has personal jurisdiction because, as further detailed below, PCPC participated in a conspiracy with one or more co-conspirator Defendants over which this Court has personal jurisdiction based, in whole or in part, on said co-conspirators' contacts with North Carolina.

55.     Defendant Playtex Products LLC is and was a designer, manufacturer, marketer, supplier, distributor and seller of tampons containing asbestos and other

carcinogens to which Plaintiff was exposed between approximately 1990 and approximately 2014.

56.     Defendant R&S Automotive is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

57.     Defendant R&S Automotive Service LLC is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

58.     Defendant Revlon Inc. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of makeup products containing asbestos to which Plaintiff was exposed between approximately 1989 and approximately 2016.

59.     Defendant Revlon Consumer Products Corp. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of makeup products containing asbestos to which Plaintiff was exposed between approximately 1989 and approximately 2016.

60. Defendant Sale Auto Mall Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of selling, maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

61. Defendant Sale Automotive Group Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of selling, maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

62. Defendant Sale Ford LLC is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of selling, maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

63. Defendant Standard Motor Products Inc. is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automotive parts, including, without limitation, brakes, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

64. Defendant Tampbrands Inc. is and was a designer, manufacturer, marketer, supplier, distributor and seller of tampons containing asbestos and other carcinogens to which Plaintiff was exposed between approximately 1990 and approximately 2014.

65. Defendant Target Corp. is and was a marketer, supplier, distributor and seller of makeup, deodorant, talcum powder and tampon products containing asbestos to which Plaintiff was exposed between approximately 1995 and approximately 2016. Moreover, Target Corp. is and was a designer, manufacturer, marketer, supplier, distributor, incensor, licensee and seller of "Sonia Kashuk" branded makeup products containing asbestos to which Plaintiff was exposed.

66. Defendant Tilghman's Garage LLC is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

67. Defendant The Estée Lauder Companies Inc. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of makeup products containing asbestos to which Plaintiff was exposed between approximately February 14, 1977, and approximately 1995.

68. Defendant The Gillette Co. is and was a designer, manufacturer, marketer, supplier, distributor and seller of deodorant products containing asbestos to which Plaintiff was exposed between approximately February 14, 1977, and approximately 1995.

69.     Defendant The Procter & Gamble Co. is and was a designer, manufacturer, marketer, supplier, distributor and seller of deodorant and tampon products containing asbestos to which Plaintiff was exposed between approximately February 14, 1977, and approximately 2014.

70.     Defendant Toyota Motor Sales USA Inc. is and was a designer, assembler, manufacturer, marketer, supplier, distributor and seller of asbestos-containing automobiles and automotive parts, including, without limitation, brakes, clutches and gaskets, to which Plaintiff was exposed between approximately 1985 and approximately 2004.

71.     Defendant Walgreen Co. is and was a marketer, supplier, distributor and seller of makeup, deodorant and tampon products containing asbestos to which Plaintiff was exposed between approximately 2002 and approximately 2016.

72.     Defendant White Owl Parts Co. Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of maintaining and repairing asbestos-containing automobiles and trucks and marketing, supplying, distributing and selling automotive and truck parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

73.     Defendant Whittaker, Clark & Daniels Inc. is and was a miner, miller, processor, importer, converter, compounder, designer, manufacturer, marketer, supplier, distributor and seller of asbestos-containing talc to which Plaintiff was exposed between approximately February 14, 1977, and approximately 2016.

74.     Defendant Winner Chevrolet Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of selling, maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

75.     Defendant Wynn Odom Ford Inc. is and was a corporation that owned, leased, possessed or otherwise controlled real property in North Carolina and engaged in the business of selling, maintaining and repairing asbestos-containing automobiles and marketing, supplying, distributing and selling automotive parts that contained asbestos to which Plaintiff was exposed between approximately 1985 and approximately 2004.

### FIRST CAUSE OF ACTION:
### NEGLIGENCE
**(Against all named Defendants)**

76.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

77.     At all material times, Defendants were miners, millers, processors, importers, converters, compounders, designers, manufacturers, assemblers, marketers, suppliers, distributors, sellers, installers, removers, users, maintainers, and/or repairers of materials, products and/or equipment that contained asbestos to which Plaintiff was exposed directly and/or indirectly through her family members.

78.     At all material times, Defendants are or were (or are liable for predecessors who are or were) each a "manufacturer" or "seller" within the meaning of N.C. Gen. Stat. §

22

99B-1 or otherwise liable under the North Carolina Product Liability statute and common law of negligence.

79.     Under N.C. Gen. Stat. § 99B-5, the relevant Defendants, as responsible manufacturers or sellers of the relevant products, acted unreasonably in failing to provide adequate warnings or instructions.  The failure to provide adequate warnings or instructions was a proximate cause of the harm for which damages are sought.  Further, at the time the relevant asbestos-containing products left the control of the Defendants, the products, without an adequate warning or instruction, created an unreasonably dangerous condition that the manufacturers or sellers knew, or in the exercise of ordinary care should have known, posed a substantial risk of harm to a reasonably foreseeable claimant; or in the alternative, after the products left the control of the Defendants, they became aware of or in the exercise of ordinary care should have known that the products posed a substantial risk of harm to a reasonably foreseeable user or consumer and failed to take reasonable steps to give adequate warning or instruction or to take other reasonable action under the circumstances.

80.     Plaintiff's exposure to asbestos from Defendants' products and/or activities directly and proximately caused her to develop malignant mesothelioma.

81.     Defendants had a duty to mine, mill, process, import, convert, compound, design, manufacture, assemble, market, supply, distribute, sell, install, remove, use, maintain, and/or repair materials, products and/or equipment that was not unreasonably dangerous or defective.

23

82.    Defendants had a duty to warn the Plaintiff, her family members and foreseeable users of said products of the hazards and defects that Defendants created knew or, within the exercise of reasonable care, should have known.

83.    Defendants had a duty to prevent Plaintiff and her family members, as consumers and/or lawful visitors, from being exposed to asbestos from Defendants' products and/or activities at Defendants' premises.

84.    Defendants knew or should have known, since at least the early 1900s, of medical and scientific data that indicated asbestos and asbestos-containing products are hazardous. Defendants, individually and collectively, ignored, failed to act upon and/or suppressed said medical and scientific date and conspired to deprive the public of said data, therefore depriving the public, including Plaintiff, of the opportunity to choose whether or not to expose themselves to asbestos from Defendants' products and/or activities.

85.    Defendants knew and should have known that Plaintiff would come into contact directly and/or indirectly with their asbestos-generating activities and/or asbestos-containing materials, products and/or equipment.

86.    Plaintiff sustained injuries caused through no fault of her own and that could not be avoided by the use of reasonable care (i.e., Plaintiff was not negligent). Plaintiff's development of malignant mesothelioma was directly and proximately caused by the negligence and carelessness of Defendants, who knew and, in the exercise of ordinary care, should have known that said products were deleterious, poisonous, cancer-causing and/or inherently dangerous and harmful to Plaintiff. Further, Defendants knew and, in the exercise

of reasonable care, should have known that Plaintiff would not recognize the danger to her health.

87. By the late 1950s, well before Plaintiff's exposure to asbestos from Defendants' products and/or activities, there were hundreds of medical and scientific articles highlighting the health hazards associated with asbestos and exposure to asbestos, including secondary exposure.

88. Defendants successfully fought government regulation and the banning of asbestos. As a result, asbestos is still legal in the United States.

89. Plaintiff's illness and disability are the direct and proximate result of the negligence and carelessness of Defendants, jointly and severally, and Defendants knew and, in the exercise of ordinary care, should have known that the asbestos-containing materials, products and equipment were deleterious, poisonous, and highly harmful to Plaintiff.

90. In addition, Defendants breached their duties and were negligent in that they:

(a) Failed to advise Plaintiff, her family members and automotive mechanics, including the mechanics employed by the Automobile Repair Defendants, of the dangerous characteristics of their activities and/or materials, products and/or equipment that contained asbestos;

(b) Failed to provide Plaintiff, her family members and automotive mechanics, including the mechanics employed by the Automobile Repair Defendants, with the knowledge as to what would be reasonably safe and sufficient apparel and protective equipment and appliances to reduce exposure to asbestos;

(c) Failed to place, post or otherwise convey any warnings or sufficient warnings regarding the health hazards associated with exposure to asbestos from their products and/or activities;

(d) Failed to take reasonable precautions and to exercise reasonable care to publish, adopt and enforce a safety plan and a safe method of handling asbestos-containing materials, products and/or equipment;

(e) Failed to test or analyze the products and/or activities in order to ascertain the extent of potential asbestos hazards;

(f) Failed to conduct research that should have been conducted in the exercise of reasonable care in order to ascertain the presence of asbestos in materials, products and/or equipment and the health hazards associated with asbestos exposure;

(g) Failed to remove asbestos products from the market despite knowing of the health hazards associated with exposure to asbestos;

(h) Failed to recommend methods, procedures, practices or protocols to prevent or minimize exposure to asbestos from their products and/or activities;

(i) Failed to develop, design, market, supply, distribute, sell, use or apply non-asbestos alternative products and/or methods that were safe;

(j) Continued to place in the stream of commerce and/or utilize asbestos-containing materials, products and/or equipment despite knowing of the health hazards associated therewith;

(k) Failed to inform Plaintiff of the need for monitoring and periodic evaluations, up to and including the filing of this Complaint; and

(l) Misrepresented or failed to disclose that asbestos was in their products or was generated by their activities, thus denying Plaintiff, her family and others of the knowledge required to take necessary safety precautions while using or otherwise being exposed to asbestos from Defendants' products and/or activities.

91. Defendants, at the time of mining, milling, processing, importing, converting, compounding, designing, manufacturing, assembling, marketing, supplying, distributing, selling, installing, removing, using, maintaining, and/or repairing materials, products and/or equipment that contained asbestos, knew and, in the exercise of reasonable care, should have

known about the serious health risks associated therewith, including the risk of cancer and mesothelioma.

92. Defendants' products in question were defective at the time they left their control.

93. Defendants were negligent and breached their duty of care to Plaintiff by taking or failing to take the actions as previously alleged to avoid harm to the Plaintiff.

94. The health hazards posed by exposure to asbestos and the resulting injuries and damages to Plaintiff were reasonably foreseeable.

95. Talc Defendants' and Talc Product Retailer Defendants' negligence *per se*, as outlined below, is further evidence of the negligence of said defendants.

96. As a direct and proximate result of the aforesaid negligent acts and/or omissions by the Defendants, the Plaintiff developed malignant mesothelioma, as a consequence of which, through no fault of her own, she is severely injured, disabled and damaged.

97. As a result of the above, Plaintiff seeks damages as are hereinafter demanded.

## SECOND CAUSE OF ACTION:
## NEGLIGENCE *PER SE*
### (Against Talc Defendants and Talc Product Retailer Defendants)

98. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

99. The Federal Food, Drug, and Cosmetic Act ("FDCA"), codified as 21 U.S.C. §§ 301-399, governs the manufacture, sale, supply, distribution and marketing of cosmetic products in the United States. 21 U.S.C. § 321(i) defines cosmetics by their intended use

27

as "(1) articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any party thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance, and (2) articles intended for use as a component of any such articles…" Talc Defendants' and Talc Product Retailer Defendants' products and their ingredients are "cosmetic" products as defined by 21 U.S.C. § 321(i).

100.    The FDCA was designed to protect consumers from hazardous "cosmetic" products. Plaintiff was a member of the class of persons the FDCA was intended to protect. The FDCA prohibits the manufacture, sale, supply, distribution and marketing of adulterated cosmetics in interstate commerce. 21 U.S.C. § 331. "Adulterations" refer to violations involving product composition—whether they result from ingredients, contaminants, processing, packaging, or shipping and handling—if the cosmetic "bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under conditions of use as are customary and usual…" 21 U.S.C. § 361. The FDCA governs all persons and companies involved in cosmetics in interstate commerce—including manufacturers, packers, distributors and retailers—who are accordingly responsible for ensuring that they are not dealing in products that are adulterated or misbranded. Under the FDCA, Defendants owed Plaintiff a duty no to sell to her or otherwise expose her to hazardous "cosmetic" products.

101.    Talc Defendants and Talc Product Retailer Defendants manufactured, processed, sold, supplied, distributed and marketed talc and talc-containing cosmetic

products throughout the United States. In violation of the FDCA, and their duty to Plaintiff thereunder, said products were contaminated with asbestos, a poisonous and deleterious disease-causing mineral known by Talc Defendants and Talc Product Retailer Defendants since the early 1900s to cause death and disease. Under normal and customary use and application, Talc Defendants' and Talc Product Retailer Defendants' talc-containing products released respirable and ingestible asbestos, and end users, including Plaintiff, were exposed to and consequently inhaled asbestos. Talc Defendants and Talc Product Retailer Defendants manufactured, sold, supplied, distributed and marketed adulterated cosmetic products that were contaminated with asbestos in clear violation of the FDCA. Talc Defendants' and Talc Product Retailer Defendants' violation of the FDCA, which governs the sale of adulterated cosmetic products, including talcum powder, makeups, deodorants, tampons and the ingredients therein, and Plaintiff's subsequent inhalation and ingestion of asbestos from said products were substantial factors in bringing about Plaintiff's mesothelioma and consequential damages. In violating the FDCA, which was enacted, among other things, to prevent the sale of asbestos-contaminated products and protect consumers from hazardous "cosmetic" products, Talc Defendants and Talc Product Retailer Defendants were and are negligent *per se*.

102. Talc Defendants and Talc Product Retailer Defendants, and their officers, directors and managing agents, participated in, authorized, expressly and impliedly ratified, and had full knowledge of and should have known of each of the acts set forth herein. Talc Defendants and Talc Product Retailer Defendants are liable for the oppressive and

malicious acts of their predecessors and divisions, and each Talc Defendant's and Talc Product Retailer Defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of and should have known of, the acts of each of their predecessors and divisions.

103.    Additionally, Talc Defendants and Talc Product Retailer Defendants were and are negligent *per se* for the aforementioned reasons pursuant to WASH. REV. CODE § 69.04.001, *et seq*.; California Sherman Food, Drug, and Cosmetic Law (California Health and Safety Code); COLO. REV. STAT. § 25-1-101, *et seq.*; MASS. GEN. LAWS ch. 94, § 186; N.C. GEN. STAT. § 106-120, *et seq*.; TENN. CODE ANN. § 53-1-101, *et seq*.; and TEX. CODE ANN. § 431.001, *et seq.*

104.    Talc Defendants' and Talc Product Retailer Defendants' violation of the FDCA (and the other regulations above) was a proximate cause of the damages hereinafter demanded.

### THIRD CAUSE OF ACTION:
### INADEQUATE DESIGN OR FORMULATION
### (Against Friction Defendants, Talc Defendants and Hennessy Industries Inc.)

105.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

106.    Friction Defendants acted unreasonably in designing and formulating their products to contain, utilize, necessitate or otherwise require asbestos or asbestos-containing components.

107. Talc Defendants acted unreasonably in formulating their products to contain talc that contained contain asbestos, likely contained asbestos and/or could contain asbestos.

108. Hennessy Industries Inc. acted unreasonably in designing its brake grinders, without adequate dust collection, elimination or exposure prevention elements, for the primary or sole purpose of grinding brakes that it knew contained, or likely contained, asbestos.

109. Under N.C. Gen. Stat. § 99B-6, the Defendants are liable for the inadequate design or formulation of the relevant product in that at the time of its manufacture, the manufacturer acted unreasonably in designing or formulating the product, and this conduct was a proximate cause of the harm for which damages are sought.

110. At the time Defendants' products left their control, the Defendants unreasonably failed to adopt safer, practical, feasible and otherwise reasonable alternative designs or formulations that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing usefulness, practicality, or desirability of the products.

111. In the alternative or in addition, at the time the product left the control of the Defendants, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design.

112. At the time Defendants' products left their control, the design or formulation of the product was so unreasonable that a reasonable person—including Plaintiff—aware of the relevant facts, would not use or consume a product of said design or formulation.

113.    Defendants' inadequate design and/or formulation of their products was a proximate cause of the harm for which Plaintiff seeks damages.

**FOURTH CAUSE OF ACTION:**
**BREACH OF IMPLIED WARRANTY**
**(Against all named Defendants except Personal Care Products Council)**

114.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

115.    The Defendants impliedly warranted that their products were of good and merchantable quality and fit for their intended use.

116.    At the time of sale, Defendants knew and had reason to know that Plaintiff and her family members intended to use Defendants' products for a particular purpose.

117.    At the time of purchase, Defendants knew and had reason to know that Plaintiff and her family members were relying on Defendants' skill and judgment to select or provide products that were suitable for said particular purpose.

118.    Plaintiff and her family members, who were unaware of the health hazards associated with Defendants' products, justifiably relied on Defendants' skill and judgment.

119.    The implied warranties made by the Defendants were breached in that their products contained asbestos at the time of sale and were hazardous to Plaintiff's health.

120.    As a direct and proximate result of the implied warranty of good and merchantable quality and fitness for the particular intended use, Plaintiff was exposed to asbestos and said exposure was a proximate cause of the harm for which Plaintiff seeks damages.

121.    As a result of the above, Plaintiffs seek damages as are hereinafter demanded.


**FIFTH CAUSE OF ACTION:**
**PREMISES LIABLITY**
**(Against Automobile Repair Defendants; American Honda Motor Co. Inc.; BMW of**
**North America LLC; Ford Motor Co.; Mitsubishi Motors North America Inc.; Nissan**
**North America Inc.; and Toyota Motor Sales USA Inc.)**

122.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

123.    At all material times, Plaintiff was a lawful visitor[10] at the premises owned, leased, possessed, operated or otherwise controlled by each Automobile Repair Defendant.

124.    At all material times, Automobile Repair Defendants were and are engaged in the business of supplying, distributing, applying, installing, removing, replacing, maintaining and repairing asbestos-containing automobiles and/or trucks and asbestos-containing automotive and/or truck parts, including, without limitation, brakes, clutches, gaskets and mufflers.

125.    Automobile Repair Defendants, acting directly and/or through their agents, servants and/or employees, caused asbestos-containing materials, products and/or equipment to be used, applied, installed, disturbed, removed, replaced, maintained or repaired at their respective premises in the vicinity of Plaintiff and her father. Said work generated asbestos

---

[10] If any Automobile Repair Defendant asserts that Plaintiff was not a lawful visitor, then the attractive nuisance exception to trespasser liability applies. *See, e.g., Coleman v. Rudisill*, 131 N.C. App. 530 (1998).

dust to which Plaintiff was directly and indirectly exposed between approximately 1985 and approximately 2004.

126.     Automobile Repair Defendants are vicariously responsible for the negligent, willful and/or wanton acts of their employees, servants and/or agents, who, while committing such negligent, willful and/or wanton acts, were acting generally within the scope of their assigned duties and employment with Automobile Repair Defendants.

127.     At all material times, Automobile Repair Defendants knew or should of have known that exposure to asbestos or asbestos-containing materials was deleterious, carcinogenic and otherwise harmful to Plaintiff and others (including their family members) present and/or working on Defendants' premises.

128.     Automobile Repair Defendants, acting directly and/or by and through their servants, agents and employees, had a duty to perform work as described herein in a reasonably safe manner and a duty to prevent injury to individuals, including Plaintiff, who were with permission working in and around the work performed by Defendants and/or their agents, servants and/or employees.

129.     Automobile Repair Defendants, acting by and through their servants, agents and employees, had a duty to warn Plaintiff, her father and other foreseeable visitors of the health hazards associated with asbestos exposure.

130.     Plaintiff's illness and disability are a direct and proximate result of the negligence and carelessness of Automobile Repair Defendants, jointly and severally, in causing Plaintiff to be exposed to asbestos at Defendants' premises, even though they knew

34

or, in the exercise of ordinary care, should have known that the asbestos and asbestos-containing materials, products and/or equipment utilized or otherwise present at their premises were deleterious, poisonous, and highly harmful to Plaintiff and could cause cancer, including malignant mesothelioma.

131.  Automobile Repair Defendants further breached their duties to Plaintiff and were negligent in that:

(a)  They and their employees, agents and/or servants handled and/or distributed asbestos-containing materials and products in such a way as to expose the Plaintiff and her father to asbestos;

(b)  They failed to provide a safe work environment for Plaintiff, her father and others working at or otherwise visiting the premises;

(c)  They failed to properly enclose, encapsulate, seal, contain and/or safeguard the premises in and around asbestos-containing materials and products in order to prevent the escape and/or release of asbestos into the surrounding area;

(d)  They failed to properly warn the Plaintiff, her father and others working at or otherwise visiting the premises of the presence of asbestos that had been released into the air as a direct and proximate result of the acts and/or omissions of Automobile Repair Defendants and/or their employees, agents and/or servants;

(e)  They failed to properly post warnings or information at their premises regarding the existence of friable or potentially friable asbestos-containing materials and products or ongoing activities involving the use and/or disturbance of asbestos-containing products and materials;

(f)  They failed to take reasonable precautions to publish, disseminate or otherwise make available to Plaintiff, her father and others working at or otherwise visiting the premises warnings or information regarding the dangerous nature of the presence of asbestos and/or asbestos-containing materials and products and to prepare, implement or disseminate a reasonable plan to protect the Plaintiff and her father from exposure to asbestos;

35

(g)     They failed to advise Plaintiff, her father and others working at the premises of the hazardous characteristics of the asbestos and/or asbestos-containing materials, products and/or equipment existing at their premises;

(h)     They failed to provide the Plaintiff, her father and others working at or otherwise visiting Defendants' premises with the knowledge as to what would be reasonably safe and sufficient apparel and protective equipment and appliances to eliminate or reduce exposure to asbestos;

(i)     They failed to place any warnings or sufficient warnings on the containers of asbestos-containing materials, products and/or equipment to warn visitors and workers, including their own employees, of the dangers to health associated with asbestos exposure;

(j)     They failed to take reasonable precautions or to exercise reasonable care to publish, adopt and enforce a safety plan and a safe method of using, applying, installing, removing, replacing, maintaining or repairing asbestos-containing materials, products and/or equipment;

(k)     They failed to make reasonable inspections of their premises;

(l)     They failed to take reasonable measures to avoid injury to Plaintiff caused by dangerous asbestos conditions of which they were aware or should have been aware;

(m)     They failed to warn, or adequately warn, lawful visitors of the presence of asbestos at their premises and the health hazards associated with exposure to asbestos;

(n)     They failed to recommend methods to improve the work environment to eliminate or reduce asbestos exposure;

(o)     They failed to use alternative products that did not contain asbestos;

(p)     They continued to use asbestos products that they knew caused health problems, including cancer and mesothelioma;

(q)     They failed to provide lawful visitors, including Plaintiff and her father with any inadequate protection from exposure to asbestos that was negligently released into the work area by Defendants and/or their employees, agents and/or servants; and

(r)     After discovering that the asbestos exposure caused a progressive lung disease, including mesothelioma, the Automobile Repair Defendants failed to inform the Plaintiff and Plaintiff's father of the need for monitoring and periodic evaluations.

132.    At all material times, Automobile Repair Defendants knew or, in the exercise of reasonable care, should have known about the risks associated with exposure to asbestos and asbestos-containing products, materials and/or equipment.

133.    Automobile Repair Defendants were negligent and breached their duty of care to Plaintiff by taking or failing to take the actions as previously alleged to avoid harm to Plaintiff and others similarly situated.

134.    The health hazards posed by exposure to asbestos and/or asbestos-containing products, materials and/or equipment at Automobile Repair Defendants' premises and the resulting injuries and damages to Plaintiff were reasonably foreseeable.

135.    Automobile Repair Defendants owed Plaintiff a duty of reasonable care and a duty to warn of all hidden or concealed dangerous conditions about which they knew or, in the exercise of reasonable care, should have known. Such dangerous conditions include, but are not limited to, the presence of asbestos-containing products, asbestos dust and asbestos-disturbing activities at Defendants' premises.

136.    The asbestos-related hazards present at Automobile Repair Defendants' premises were not apparent to Plaintiff, and Plaintiff did not have superior or equal knowledge as to the asbestos content of the products utilized at said premises or the health hazards associated therewith.

137.     As a direct and proximate result of the aforesaid negligent acts and/or omissions by Automobile Repair Defendants, Plaintiff developed malignant mesothelioma, as a consequence of which, through no fault of her own, she is severely injured, disabled and damaged.

138.     As a result of the above, Plaintiff seeks damages as are hereinafter demanded.

**SIXTH CAUSE OF ACTION:**
**NEGLIGENT HIRING, TRAINING AND/OR**
**SUPERVISION OF EMPLOYEES AND AGENTS**
**(Against Automobile Repair Defendants; American Honda Motor Co. Inc.;**
**BMW of North America LLC; Ford Motor Co.; Mitsubishi Motors North America**
**Inc.; Nissan North America Inc.; Talc Product Retailer Defendants; and**
**Toyota Motor Sales USA Inc.)**

139.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

140.     Defendants hired, retained, contracted with and/or otherwise employed individuals to perform repair work on vehicles and/or recommend, select, provide information regarding and/or apply products.

141.     Defendants had a duty to hire, retain, contract with and/or otherwise employ individuals who were competent and would otherwise perform their job functions and assignments in a reasonably safe manner.

142.     Defendants had a duty to properly and adequately train their employees, servants, contractors and agents in a proper and safe manner and to perform their functions and assignments safely.

143.    Defendants were negligent in that they hired, retained, contracted with and/or otherwise employed individuals who were untrained, insufficiently trained, improperly trained, incompetent, unsafe, careless, reckless and who otherwise acted in an unreasonable and unsafe manner in the performance of their job functions and assignments, including, but not limited to, their purchase, installation, handling, removal, maintenance, repair, recommendation, marketing and/or application of products containing asbestos.

144.    The Defendants were negligent in that they failed to properly train, inform, equip and monitor supervisors, employees and agents, and they failed to properly supervise, monitor, correct or modify negligent work practices employed by their employees, servants, agents and/or contractors.

145.    The purchase, installation, handling, removal, maintenance, repair, recommendation, marketing and/or application of products containing asbestos by Defendants and/or their employees, servants, agents and/or contractors was done in such a negligent and irresponsible manner that caused Plaintiff to be exposed to asbestos.

146.    As a direct and proximate result of Defendants' negligent hiring, training and/or supervision of their employees, agents, servants and/or contractors, Plaintiff was exposed to asbestos.

147.    Accordingly, Plaintiff seeks damages as are hereinafter demanded.

**SEVENTH CAUSE OF ACTION:**
**FRAUD/FALSE REPRESENTATION**
**(Against Talc Defendants; Talc Product Supplier Defendants; and PCPC)**

148.    For decades, Talc Defendants and Talc Product Supplier Defendants have mined, processed, manufactured, distributed, marketed and supplied products composed of talc that were sold and marketed as safe for daily use by consumers on their bodies to give off a pleasant smell, mask odors, prevent chaffing and/or absorb moisture. Talc Defendants' and Talc Product Supplier Defendants' products were advertised as healthy for babies, children and adults to be applied regularly to maintain freshness, keep skin soft, mask odors with a floral fragrance, prevent chaffing and/or absorb moisture.

149.    Talc Defendants, Talc Product Supplier Defendants and PCPC made false statements to Plaintiff, her family, the general public, news media and government agencies that exercise regulatory authority over Talc Defendants and Talc Product Supplier Defendants, including the U.S. Food & Drug Administration ("FDA"), the National Institute of Occupational Health and Safety ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), the Mine Health and Safety Administration ("MHS"), and the National Toxicology Program ("NTP"), which, in turn, proximately caused Plaintiff's harm through intentional efforts to deceive the general public as to the safety and asbestos content of their products.

150.    Talc Defendants and Talc Product Supplier Defendants, since the early 1900s, possessed medical and scientific data that raised concerns regarding the presence of asbestos in talc and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products.

151.    Talc is a hydrous magnesium silicate, inorganic material that is mined from the earth. Talc is used in the manufacture of goods, such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in Talc Defendants' and Talc Product Supplier Defendants' products, talc is known as "talcum powder."

152.    Geologists and mining companies, including Talc Defendants and Talc Product Supplier Defendants and their suppliers, experts, agents and advisors, have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s in the United States, note the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.

153.    Talc Defendants, some of which have been and still are the largest talc producers and/or talc-containing product manufactures in the world, admit that they have long employed doctors, scientists, mineralogists and toxicologists, and that they have long maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of asbestos in talc and talc deposits.

41

154. Beginning in the 1930s, medical and scientific literature emerged indicating talc was and is commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, silica, quartz, nickel and arsenic. Within the next several decades, an ever-growing body of medical and scientific literature demonstrated that direct and secondary inhalation of, and exposure to, talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease, cancer and death.

155. Talc Defendants and Talc Product Supplier Defendants and/or their affiliates, employees, agents or suppliers were members of the National Safety Council. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated "The results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of National Safety News, an article entitled "No Halfway Measures in Dust Control" by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to

"clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

156.    In 1936, the National Safety Council published an article entitled "Lesser Known Facts About Occupational Diseases" stating that "exposure to asbestos fibers, present in the weaving and grinding of dry asbestos material offers another type of dust which may cause fatalities among workers." In 1958, The New York Department of Labor, published Industrial Code Rule No. 12 establishing regulations applying to all employees and employers relating to dangerous air contaminants and listing both asbestos and talc as such substances.

157.    In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley, et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 AM. IND. HYG. ASSOC. J. 350-354 (1968).

158.     A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. TOXICOL. ENVIRON. HEALTH 255-284 (1976). The results of the Mount Sinai study were soon picked up and reported by both the *New York Times* and the *Washington Post* that same year.

159.     In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Talc Defendants and Talc Product Supplier Defendants and the Cosmetic, Toiletry and Fragrance Association (now the Personal Care Products Council), an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Talc Defendants' and Talc Product Supplier Defendants' products.

160.     In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure, but rather contained various fibrous minerals, including tremolite, anthophyllite, and

chrysotile. This was not unexpected, as the study imparts, as these types of fibers are often present in fibrous talc mineral deposits. Among other things, the authors noted the unknown significant amounts of such materials in products used without precaution may create unsuspected problems. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders were contaminated with asbestos, there is no evidence showing that positive results or the brand names of contaminated products were communicated to any governmental agency, the media or the public.

161.    In 1971, the New York City of Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy and x-ray diffraction analysis (XRD), and found them to contain 5-25% tremolite and anthophyllite asbestos fibers under 5 microns.

162.    Thereafter, within the same year, a symposium was held in August of 1971 at the FDA to discuss the problem of asbestos contamination in talcum powders with the talc industry, government officials and doctors and scientists from Mt. Sinai Hospital— then the epicenter of the medical and scientific study of asbestos. Among other statements, participants and attendees heard: that asbestos should be banned in talcum powders; models should be set up to measure the levels exposure to asbestos experienced by persons using talcum powder containing asbestos at the lowest level of microscopic detection; and that finding asbestos in talc and talcum powder is extremely difficult, and the only truly reliable

way to determine the asbestos content of talc and talcum powder is through using a transmission electron microscope and electron diffraction. Talc Defendants, citing costs as well as their fear of the public learning talc was contaminated with asbestos, ignored and completely rejected any measures to meaningfully test all their products to make sure they were asbestos-free and free of other cancer causing contaminates.

163.    After this 1971 meeting, Dr. Weissler of the FDA hired Dr. Seymour Z. Lewin to test commercially available talcum powders and test them for asbestos. Dr. Lewin tested 195 samples and found asbestos of varying amounts in 43 samples. Many of Dr. Lewin's positive results were eventually corroborated by Pfizer Inc. The results however were uncorroborated by two other laboratories, leading the FDA to the conclusion that XRD, optical and electron microscopy and diffraction must be used to find asbestos in talc and talcum powders.

164.    Contemporaneously, evidence began to emerge from testing conducted by various regulatory agency revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing and drugs to be asbestos-free. These, of course, were some of the same grades of talc used by Talc Defendants.

165.    The talc industry's response, including that of the Talc Defendants, was swift and well-coordinated through the PCPC, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry that conspired and

worked in concert with the Talc Defendants to purposely create a flawed, voluntary testing and surveillance methodology for detecting asbestos and other carcinogens in talc and block efforts to label and warn consumers regarding the dangers associated with the talcum products, such as Talc Defendants' and Talc Product Retailer Defendants' products.

166.    Respecting the FDA's proposed 1972 ruling-making, the FDA Director of Product Development and Cosmetics, Dr. Schaffner, invited representatives of the talc industry to a meeting in August of 1972 to discuss the results of Dr. Lewin's study of 195 talcum powders and inform them that the FDA was preparing to release a "Proposed Statement of Policy On Asbestos in Cosmetics Containing Talc." Dr. Schaffner explained that he was duty-bound and must publicize the brand names of the talcum powders that contained asbestos. The president of the CTFA, Dr. Merritt, strongly objected to the FDA alerting the general public or publishing or publicizing the brand and manufacturers' names of the talcum powders, as it would cause them "economic hardship." The CTFA's president also threatened to sue the FDA to prevent the disclosure of these names. Unsurprisingly, the FDA and Talc Defendants never revealed or publicized the brand names of the talcum powders that contained asbestos, much to the detriment of the Plaintiff and the general public.

167.    In 1973, the CTFA created a talc subcommittee and the Scientific Advisory Committee to develop a testing methodology for measuring asbestos in talc. Initially, the CTFA designated a group of its members to tests talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples

47

of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated among the members, including representatives of Talc Defendants. Of the eight participating members, four found asbestos in every sample, three did not find asbestos in any sample (including the purposely spiked sample), and one found asbestos only in the spiked sample. In conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is not using optical microscopy, but rather transmission electronic microscopy ("TEM") and electron diffraction. The same members, however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite Talc Defendants then owning or having unfettered access to TEM and electron diffraction equipment.

168. From there, the difference between what Talc Defendants and the CTFA were telling themselves and each other began to diverge from what they were telling and representing to the FDA. Among themselves, Talc Defendants and others in the industry knew that there was no such thing as asbestos-free talc mine, mill or powder—only talc in which asbestos could not be detected using the prevailing, most economical analytical methodology, x-ray diffraction, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%. The dangerousness of this cannot be understated, as one milligram of talc with 1% asbestos contains over 80,000,000 asbestos fibers.

169. Talc Defendants, Talc Product Retailer Defendants and the CTFA also did

not disclose to the FDA that the overwhelming majority of talcum powder manufacturers and sellers were not testing their products for asbestos, and if they were testing, it was done so superficially—only four or so grams per 20 tons of pre-shipment and pre-processed talc. Talc Defendants, Talc Product Retailer Defendants and the CTFA also failed to the inform the FDA that they were not testing off-the-shelf talcum powder products that the public was using, but rather samples that were years old. They also failed to inform the FDA that they were limiting their testing of talc to only one type of asbestos fiber to the exclusion of all other fiber types that commonly contaminate talc. Moreover, to the extent Talc Defendants found asbestos in their samples, these positive results were not reported to the FDA. Instead, on their behalf, the CTFA sent letters to the FDA in March of 1976 falsely claiming that industry testing had shown all their talcum powder products to be completely free of asbestos.

170.    Beginning in 1975 and 1976, researchers at New York Air Resources Board, Mt. Sinai School of Medicine, and the FDA became increasingly concerned, if not disgusted, that the CTFA and Talc Defendants were dragging their feet on the issue of asbestos in talc and talcum powders. They had not issued any recalls, provided consumer warnings, informed the FDA of any effort to ensure that talcum powders on the market did not contain asbestos, or developed a verifiable methodology or protocol for ensuring that talc and talcum powder did not contain asbestos.

171.    Taking matters into their own hands, Mt. Sinai Hospital researchers published a follow-up article to Dr. Lewin's 1971 study, which showed that some of Talc

49

Defendants' and Talc Product Retailer Defendants' talcum powders that were tested contained over 20% asbestos. The researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." The results of the Mount Sinai study were soon picked up and reported by both the *New York Times* and the *Washington Post* that same year.

172.    Talc Defendants and the CTFA responded to these developments by falsely claiming that industry was doing "everything" it could to solve the problem, and by issuing a press releases falsely claiming that chrysotile has never been found in talcum powders and/or completely failing to disclose that tremolite was not only commonly found in talc, but that undisclosed test after undisclosed test showed that finished talcum powder products contained tremolite asbestos.

173.    With news of asbestos in talc finally making some headlines, the CTFA finally began in earnest to produce a voluntary protocol and methodology that would provide Talc Defendants and Talc Product Retailer Defendants cover from both lawsuits and regulation. Egregiously, as concerned media members, citizens and regulators began asking more questions about which other brands of talcum powder might contain asbestos, the Talc Defendants and CTFA refused to comment and/or falsely represented that talcum powders have never contained asbestos.

174.    Talc Defendants and third parties collectively met with and corresponded

with the CTFA, as well as collectively met with the FDA, to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tens of thousands of pounds of talc to be used in consumer products. Talc Defendants' "voluntary" method, that was developed collectively by Talc Defendants and advocated to the FDA by Talc Defendants in lieu of regulations requiring asbestos labeling or warnings on talcum powder products, did not work in that levels of asbestos contamination in talc commonly and demonstrably fell below the detection limit of XRD. Talc Defendants also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts Talc Defendants tested would not reveal the true level of contamination in the talc products sold to their customers, such as Plaintiff and her family.

175.    In support of their voluntary XRD methodology, which was finally published in 1977, the CTFA produced letters to the FDA written by their members, including Talc Defendants, identifying tests they had conducted showing their talcum powder products did not contain asbestos. The CTFA, Talc Defendants and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders were contaminated with asbestos.

176.    Talc Defendants made and published such representations, claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that that their testing of talc reaching consumers was "safe," despite knowing the contrary. Talc Defendants intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content

of their products, and thereby inform the public, including Plaintiff, that talc-containing products contained asbestos and were therefore dangerous.

177.   The CTFA then published an article in 1979 stating it conducted over three thousand tests of talcum powders and none of them contained chrysotile. The article and report do not mention whether the talcum powders tested contained tremolite or anthophyllite. This publication and half-truths was conveyed to the FDA and the public, effectively staving off any proposed regulations and seemingly resolving the issue. Thereafter CTFA's methodology became the standard by which all talc was analyzed by the entire industry, including talc used in personal care products today.

178.   The CTFA and representatives of some Talc Defendants have represented to various national news media and the public at large that their products are "asbestos-free," when, in fact, Talc Defendants actually meant they did not "detect" asbestos according to their infrequently used and inadequate testing protocol. "No asbestos detected" means something much different than "no asbestos," but due to Talc Defendants' repeated conflation of the terms, the public has been lead to erroneously believe talc products are safe. Furthermore, since Talc Defendants did not have a sufficient testing protocol in place to support their claim that their products were safe or asbestos-free, such statements were recklessly made as they had no reason to believe them.

179.   Between 1970 through the 1990s, tests conducted by the talc industry and Talc Defendants continued to show that talc and talcum powder products contained asbestos. None of these positive tests have ever been produced or made known to any

regulatory agency, and knowledge of their existence is only because of litigation against these companies.

180.     Talc Defendants' and the CTFA's failure to disclose these positive results and the inadequacies of their testing protocols continued through the 1980s, 1990s and 2000s, when various government agencies raised the issue of safety of talc, including the issue of asbestos-contamination.

181.     To this day talc containing products presently on the market contain and/or are contaminated with asbestos. Instead of publicizing this fact, Talc Defendants continue to deny all the above purely to protect themselves in litigation and profitability, much to the detriment of the public in the United States and worldwide.

182.     Since at least 1979, Talc Defendants have conducted a campaign to convince the public that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are safe as a consequence. Nothing could be further from the truth: the FDA has never been assigned a budget by congress to regulate cosmetics including asbestos in talcum powders. Talc Defendants concerns for the safety of their products have always been voluntary, and under the auspices of the CTFA—a private industry group, who in it 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States. Indeed, as of today asbestos containing talc in cosmetics has not been banned by the CTFA or FDA.

183.     Some Talc Defendants and Talc Product Supplier Defendants did not begin to test their products, if at all, to determine whether asbestos was present until the FDA

inquiry began in the 1970s. Talc Defendants and Talc Product Supplier Defendants named herein and third parties collectively met with and corresponded with the CTFA, as well as collectively met with the FDA, to individually and collectively advocate for the use of "voluntary" x-ray diffraction testing purportedly "routinely" on miniscule portions of the tens of thousands of pounds of talc obtained from the mining sources to be used in the consumer products, followed by fewer "periodic" tests by TEM, which offers a more sensitive level of detection. This "voluntary" method that was developed collectively by and to which each Talc Defendant and Talc Product Supplier Defendant agreed was advocated to the FDA by Talc Defendants and Talc Product Supplier Defendants in lieu of regulations requiring labeling and warnings on talcum powder products, despite Talc Defendants and Talc Product Supplier Defendants knowing that levels of asbestos contamination in talc commonly and demonstrably fell below the detection limit of XRD and despite knowing that contamination was not uniformly distributed such that the tiny amounts Talc Defendants and Talc Product Supplier Defendants tested would not adequately reveal the true level of contamination in the talc that reached consumers, such as Plaintiff.

184. Talc Defendants and Talc Product Supplier Defendants (and other entities in the talc industry and cosmetic industries), individually and collectively, failed to report to the FDA tests performed both internally and by an outside laboratory confirming the presence of asbestos in both their finished products as well as talc shipments from Talc

54

Defendants and Talc Product Supplier Defendants and other sources that were used to produce finished products.

185.    Certain Talc Defendants and Talc Product Supplier Defendants, and even the outside laboratory McCrone Associates, further sent letters to the CTFA, to be and which were forwarded collectively to the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such false representations were made. Certain Talc Defendants and Talc Product Supplier Defendants made and published such representations claiming that their testing method was adequate, claiming they were ensuring that talcum powder products were safe, and claiming that their testing of talc reaching consumers was "safe," despite knowing the contrary. Certain of the Talc Defendants and Talc Product Supplier Defendants intentionally and knowingly did so to avoid FDA regulations that may have required the Talc Defendants to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiff, that talcum powder products contained asbestos and were therefore dangerous.

186.    After 1976, Talc Defendants and Talc Product Supplier Defendants herein continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos in the talc being used to manufacture their products.

187.    Talc Defendants and Talc Product Supplier Defendants failed to place any warning on their talc and talcum powder products or ever disclose the fact that these

products contained asbestos at any point, up to and including the present, despite the clear hazard and direct information that their products did and continue to contain asbestos.

188.    Talc Defendants and Talc Product Supplier Defendants collectively and through explicit agreement and consciously parallel behavior controlled industry standards regarding the testing, manufacture, sale, distribution and use of asbestos-containing talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiff, regarding the hazards of exposure to asbestos dust and fibers from talc and talc-containing products.

189.    Talc Defendants and Talc Product Supplier Defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including Plaintiff, of the serious bodily harm and/or death which may result from the inhalation of, ingestion of and exposure to asbestos fibers and dust emanating from and released by their talc and talc-containing products.

190.    Talc Defendants and Talc Product Supplier Defendants, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases from the use of talc and talcum powder, and specifically talc and talcum powder used in the production of products to which Plaintiff was exposed.

191. Talc Defendants and Talc Product Supplier Defendants distorted the results of medical examinations conducted upon Plaintiff and/or individuals similarly situated who were exposed to asbestos fibers and dust by falsely stating and/or concealing the nature and extent of hazard to which Plaintiff' and those similarly situated had been subjected through the use or exposure to talc and talcum powder products.

192. Talc Defendants and Talc Product Supplier Defendants, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including Plaintiff, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

193. Talc Defendants and Talc Product Supplier Defendants conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior:

(a) to withhold from users of their products—and from persons who Talc Defendants and Talc Product Supplier Defendants knew and should have known would be exposed thereto—information regarding the health risks of inhaling or ingesting asbestos fibers and dust contained in their talc and talcum powder products;

(b) to eliminate or prevent investigation into the health hazards of exposure to asbestos fibers and dust in talc and talcum powder products;

(c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers; and

(d) to falsely represent that their talc and talcum powder products were safe for use by consumers.

57

194. Plaintiff reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by Talc Defendants and Talc Product Supplier Defendants regarding the hazards of their asbestos-containing talc and talcum powder products and was therefore deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

195. Talc Defendants and Talc Product Supplier Defendants, both acting individually and in concert with others, violated the common-law duty of care owed to Plaintiff or otherwise engaged in intentionally culpable activity that caused her to suffer severe injuries and damages.

196. The actions and inactions of Talc Defendants and Talc Product Supplier Defendants, independently and collectively, constitute a pattern or practice of intentionally wrongful conduct and/or malice resulting in injuries to Plaintiff.

197. By reason of the foregoing, Talc Defendants and Talc Product Supplier Defendants are jointly and severally liable to Plaintiff for the injuries and damages sustained by virtue of their fraudulent and intentionally deceptive actions and conspiracy to commit such actions.

198. Personal Care Products Council, as the entity is now known, was founded in 1894 as the Manufacturing Perfumers' Association ("MPA"). The MPA was established to coordinate industry opposition to Congressional legislation that would increase the tariff on imported raw materials, affecting the cost of producing toilet goods. In 1922, the MPA changed its name to the American Manufacturers of Toilet Articles ("AMTA"), extending

its membership eligibility to companies beyond perfumers. By 1924, AMTA membership included 115 active members and 105 associate members, including many of the Talc Defendants and Talc Product Supplier Defendants named herein. In 1970, the AMTA changed its name to the CTFA. In 2007, the CTFA changed its name to PCPC. Many of the Talc Defendants and Talc Product Supplier Defendants were members of or otherwise contributed resources and/or financial support to the AMTA, CTFA and/or PCPC. PCPC's more than 600 member companies manufacture, distribute, and supply "the vast majority of personal care products marketed in the United States."

199.   In 1989, the CTFA formed a charitable organization, now known as the Personal Care Products Council Foundation, which developed the "Look Good Feel Better" program. Today, the PCPC, through collaboration with the American Cancer Society and the Professional Beauty Association, administers the "Look Good Feel Better" program, which is free, purports to help women suffering from cancer to maintain their confidence and self-esteem, and provides services, makeup and cosmetics, workshops, and events to women in Washington.

200.   The PCPC has long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. One of the early indications of asbestos in cosmetic talc was reported by Schulz and Williams' 1942 paper on talcs in animal studies. In the Schulz and Williams 1942 paper, five "Talcum powder" samples are listed with serpentine concentrations (asbestos) ranging from 14 to 49%, with one sample containing trace of tremolite (asbestos). Cralley published a paper in 1968 in the American

59

Industrial Hygiene Association Journal reporting the presence of mineral fibers in 22 over-the-counter talc products, ranging in concentration from 8% to 30%. XRD analysis of the talcs revealed most fibers to be fibrous talc, but tremolite (asbestos), anthophyllite (asbestos), and chrysotile (asbestos) were also detected. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s in the United States, note the presence of tremolite, anthophyllite and chrysotile (all asbestos) commonly among those minerals found within talc deposits.

201. "Asbestos" has become a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite and crocidolite. XRD determines the crystalline structure of minerals by measuring the diffraction angles of an x-ray beam that has passed through the mineral. While XRD can identify amphibole minerals, it cannot determine if the mineral identified is fibrous or not, and thus it alone is not reliable for asbestos identification. Transmission electron microscopy is the most sensitive and reliable instrument for detection and identification of all asbestos types in all size ranges. Finally, an energy-dispersive x-ray detector ("EDX") interfaced with a TEM yields elemental composition, confirming the asbestos fiber's identity. Only TEM can detect and identify the very thin asbestos fibers that are the greatest health hazard. As such, it is the necessary final step to confirm an absence of asbestos contamination. By the 1970's, TEM was already established as a reliable method for asbestos identification. McCrone Associates,

the laboratory selected by several cosmetic talc producers, including many of the Talc Defendants and Talc Supplier Defendants, to analyze their products, was already using TEM for definitive asbestos analysis. An article by McCrone and Stewart (1974) describes the advantages of TEM for asbestos analysis and states that the TEM "only recently installed in our laboratory will undoubtedly be the ideal instrument for the detection and identification of very fine asbestos fibers."

202.    Dr. Lewin of New York University disclosed twice in 1972 that asbestos contamination had been found in cosmetic talc. In a report to the FDA on August 3, 1972, Dr. Lewin reported that of 102 talc products, 20 had tremolite, 7 had chrysotile, 9 had both tremolite and chrysotile, and 7 had substantial percentages of one of both of these asbestiform minerals. XRD had been used as the first step in analysis and the presence of asbestiform mineral(s) and was verified by the use of optical microscopy to disclose the presence of significant numbers of fiber particles. Shortly thereafter, Dr. Lewin reported to Defendant Whittaker, Clark and Daniels Inc. on September 30, 1972, that Italian talc 1615 contained about 2% tremolite and 0.5% chrysotile as determined with XRD and detailed microscopic exam. In a July 31, 1973, review of Dr. Lewin's testing of 195 talc samples, the FDA found "good semi-quantitative agreement" for tremolite on selected samples re-analyzed using optical microscope analysis by FDA and XRD by Pfizer. Agreement was not as good for chrysotile, but the review did warn that optical microscopy could "completely miss the presence of chrysotile if the fibers are submicroscopic, which may well be the case in finely-milled talc." In 1972, ES Laboratories reported that 1615 talc

contained 1% chrysotile and that 4615 talc contained 3% chrysotile and 3% anthophyllite. An August 23, 1973, report by Johns-Manville on TEM analysis of commercial talcs reported that four of fourteen samples contained chrysotile believed to be part of the mineralogical system and another five had chrysotile content to be 1000 ppm or less. Only five samples did not have detectable chrysotile. Pages from the laboratory notebook of Colgate-Palmolive Co. scientist Paul Briscese from March 7, 1976, show that Old Regal (North Carolina) talc tested positive for tremolite, New Montana talc tested positive for anthophyllite and tremolite, and Italian talc tested positive for tremolite.

203.    A December 10, 1973, report of the CTFA's Talc Subcommittee disclosed that optical microscope analyses of talcs from Italian, Montana I & II, Alabama, Vermont, and North Carolina mines had failed the proposed FDA's method because of elevated chrysotile concentrations. This December 10, 1973, CTFA report also showed that several laboratories had reported chrysotile asbestos in many of the talc samples sent out by CTFA for evaluation of analytical methods as well as the several identifications of asbestos in talc mentioned.

204.    In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. The CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, including many of the Talc Defendants and Talc Product Supplier Defendants herein, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Talc

Defendants' and Talc Product Supplier Defendants' products. On September 3, 1973, the FDA sent the CTFA a letter regarding various means of measuring asbestos in talc, stating that "conventional methods employing x-ray diffraction or differential thermal analysis are not sufficiently reliable to produce quantitative results of the desired precision." The FDA further advised the CTFA that it "has been exploring refractory optical microscopy as a means of measuring asbestos in talc." The CTFA responded to the FDA's public notice on its proposed optical microscopy method on December 26, 1973. The CTFA contended that the proposed method was not "reliable" for the detection of asbestos in talc, recommended a "collaborative effort between FDA and industry to develop such a method," and urged deferment of the proposed promulgation. Minutes of the CTFA Talc Subcommittee meeting on March 15, 1976, at FDA reports that FDA's "Dr. Shaffner suggested the possibility of having industry report periodically on the results of its analysis to the FDA." Dr. Estrin of the CTFA responded that "the subcommittee would give serious consideration to this suggestion."

205. CTFA Method J4-1, published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications." The published method, rather, relies on XRD with "the level of detection of amphibole by this method is 0.5% and above." The CTFA met with and corresponded with the Talc Defendants and Talc Supplier Defendants named herein and third parties, as well as met with the FDA, to individually and collectively advocate for the use of inadequate XRD testing purportedly "routinely" on miniscule portions of the tens of

63

thousands of pounds of talc obtained from the mining sources to be used in the consumer products, followed by fewer "periodic" tests by TEM, which offers a more sensitive level of detection. This "voluntary" method, that was published by the CTFA and known as the "J4-1" method, was collectively developed by and to which the CTFA and the Talc Defendants and Talc Product Supplier Defendants agreed was advocated to the FDA by the CTFA, Talc Defendants and Talc Product Supplier Defendants in lieu of regulations requiring labeling and warnings on talcum powder products, even though the CTFA, Talc Defendants and Talc Product Supplier Defendants knew that the J4-1 method would not adequately reveal the true level of asbestos in the talc that reached consumers, such as Plaintiff. The first "round robin" tests, which analyzed a "CTFA Tremolite-Spiked Talc," had 6 of 7 participating laboratories failing to detect the tremolite. In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using the CTFA's own J4-1 method. There is no evidence that the CTFA ever shared this stunning failure with the FDA.

206.    The CTFA did not disclose the failures of the CTFA J4-1 method in detecting asbestos in a sample known to contain tremolite asbestos to the FDA, nor did the CTFA disclose the inadequacies of its J4-1 methodology with the FDA. The CTFA, as well as Talc Defendants, Talc Product Supplier Defendants and other entities in the talc industry and cosmetic industries, individually and collectively, failed to report to the FDA tests performed both internally and by an outside laboratory confirming the presence of asbestos in both Talc Defendants' and other CTFA members' finished products as well as talc

shipments from talc suppliers and other sources that were used to produce finished products. Instead, the CTFA sent letters to the FDA stating that results of testing of talc used by them after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such intentionally false representations were made. The CTFA and certain Talc Defendants and Talc Product Supplier Defendants made and published such representations claiming that their testing method was adequate, claiming they were ensuring that talcum powder products were safe, and claiming that their testing of talc reaching consumers was "safe," despite knowing the contrary. The CTFA intentionally and knowingly did so to avoid FDA regulations that may have required the Talc Defendants, Talc Product Supplier Defendants and others to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiff, that talcum powder products contained asbestos and were therefore dangerous.

207. Minutes of the CTFA Talc Subcommittee from February 24, 1975, stated "It was agreed, however, that chrysotile is never found in cosmetic talcs, based on numerous analyses by several investigators. . ." When referring to the challenge of chrysotile detection, an article "Talc" in the January/March 1976 *CTFA Cosmetic Journal*, states that "The only known backup method for a positive identification in this event, is [TEM] with selected area diffraction." However, "despite many efforts, the committee had been unable to find a sample of cosmetic talc containing naturally occurring asbestos … it was asked, 'Why should we test for chrysotile if there isn't any?'" The CTFA's Specification for

Cosmetic Talc, revised on October 7, 1976, represented that no fibrous amphibole, asbestiform tremolite, et al. were detected in cosmetic talc. Even after 1976, the CTFA, Talc Defendants and Talc Product Supplier Defendants herein continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos in the talc being used to manufacture cosmetic products. The CFTA continued to represent that no asbestos was detected in cosmetic talc. This material representation adversely and directly impacted the FDA's attempt to adequately test consumer talc for asbestos. The most sensitive method of identifying or detecting asbestos in cosmetic talc, TEM-SAED, was not used because the CTFA represented that its "ultra sensitivity could be a problem" and that it was expensive to use. Instead, its J4-1 method relied on XRD alone for detection of asbestos at greater than 0.5%, a concentration that could allow more than a billion fibers per gram of talc to be passed off as containing no asbestos.

208.   The FDA, and ultimately, the Plaintiff and her family members, directly and/or indirectly relied upon the CTFA's false representations regarding the presence of asbestos in cosmetic talc. The FDA's letter dated January 11, 1979, states "In cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding the CTFA's misrepresentations was obvious seven years later. In a response to a citizen petition to require an asbestos warning label on cosmetic talc, a July 11, 1986, FDA letter cites its cooperation with the talc industry such that an "analytical methodology was sufficiently developed" to assure that "such talc be free of fibrous amphibole…" The CTFA J4-1

method has continued to be the cosmetic talc industry's method for assuring talc-free asbestos for the past four decades. The use of TEM, recognized by the CTFA as offering "greater sensitivity" for asbestos analysis, continued to increase over the next decades as its advantages were applied to more matrices. In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc powder with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry continues, four decades later, to use its antiquated and wholly inadequate J4-1 method.

209. The CTFA, Talc Defendants and Talc Product Supplier Defendants collectively and through explicit agreement and consciously parallel behavior controlled industry standards regarding the testing, manufacture, sale, marketing, distribution and use of asbestos-containing talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiff and her family members, regarding the hazards of exposure to asbestos dust and fibers from talc and talc-containing products.

210. The CTFA, Talc Defendants and Talc Product Supplier Defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including Plaintiff and her family members, of the serious bodily harm and/or death which may result from the inhalation of, ingestion of and exposure to asbestos fibers and dust emanating from and released by their talc and talc-containing products.

211. The CTFA, Talc Defendants and Talc Product Supplier Defendants, through agreement and consciously parallel behavior, knowingly and intentionally released,

published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases from the use of talc and talcum powder, and specifically talc and talcum powder used in the production of products to which Plaintiff was exposed.

212. The CTFA, Talc Defendants and Talc Product Supplier Defendants, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive regulatory agencies and the public at large, including Plaintiff and her family members, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

213. The CTFA, Talc Defendants and Talc Product Supplier Defendants conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior:

(a) to withhold from users of their products—and from persons who the CTFA, Talc Defendants and Talc Product Supplier Defendants knew and should have known would be exposed thereto—information regarding the health risks of inhaling or ingesting asbestos fibers and dust contained in their talc and talcum powder products;

(b) to eliminate or prevent investigation into the health hazards of exposure to asbestos fibers and dust in talc and talcum powder products;

(c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers; and

(d) to falsely represent that their talc and talcum powder products were safe for

use by consumers.

214.    Plaintiff and her family members reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by the CTFA, Talc Defendants and Talc Product Supplier Defendants regarding the hazards of their asbestos-containing talc and talcum powder products and was therefore deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products. Plaintiff and her family members had a right to rely upon the CTFA's, Talc Defendants' and Talc Product Supplier Defendants' misrepresentations to the FDA and the public that cosmetic talc did not contain asbestos.

215.    The CTFA, Talc Defendants and Talc Product Supplier Defendants, acting individually and in concert with others, violated the common-law duty of care owed to Plaintiff or otherwise engaged in intentionally culpable activity that caused her to suffer severe injuries and damages.

216.    The actions and inactions of the CTFA, Talc Defendants and Talc Product Supplier Defendants, independently and collectively, constitute a pattern or practice of intentionally wrongful conduct and/or malice resulting in injuries to Plaintiff.

217.    By reason of the foregoing, the CTFA is jointly and severally liable to Plaintiff for the injuries and damages sustained by virtue of its fraudulent and intentionally deceptive actions and conspiracy to commit such actions.

## EIGHTH CAUSE OF ACTION:
## FRAUD/FALSE REPRESENTATION
### (Against all Defendants)

218.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

219.    During, before and after Plaintiff's exposure to asbestos from Defendants' products, activities and/or at their premises, Defendants falsely represented facts, including the dangers of asbestos exposure, to Plaintiff, her family members and others similarly situated in the particulars alleged in the paragraphs above, while Defendants each had actual knowledge of said dangers of asbestos exposure to persons such as Plaintiff, and while Defendants each knew of the falsity of their representations.

220.    Defendants made the representations regarding the safety of their products, activities and/or premises in reckless disregard of the truth or falsity thereof.

221.    The foregoing representations were material conditions precedent to Plaintiff' continued exposure to asbestos from Defendants' products, activities and/or premises, and Defendants each intended that Plaintiff act upon the representations by continuing her exposure to the asbestos. Plaintiff, through no fault of her own, was ignorant of the falsity of Defendants' representations and rightfully relied upon the representations.

222.    As a direct and proximate result of Plaintiff's reliance upon Defendants' false representations, Plaintiff has suffered injury and damages hereinafter described.

**NINTH CAUSE OF ACTION:**
**FAILURE TO WARN AND INSTRUCT**
**(Against all Defendants)**

223.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

224.    At all times material hereto, Defendants knew and should have known of the health hazards associated with exposure to asbestos.

225.    Defendants had a duty to warn Plaintiff and her family members of the dangers associated with exposure to asbestos from their products, activities and/or premises.

226.    Despite Defendants' knowledge of the health hazards associated with the asbestos, they failed to warn or instruct, or adequately warn or instruct, Plaintiff and her family members of the dangers, including, but not limited to:

(a)    Failing to provide adequate cautions, warnings, hazard statements and/or explanations in connection with their products, activities and/or premises, which should have been designed to provide to the Plaintiff and her family members knowledge about the health hazards associated with exposure asbestos and how to eliminate, reduce or minimize such hazards;

(b)    Failing to provide adequate product inserts, informative brochures, literature, posters and/or other written materials with their products, which should have been designed to provide to the Plaintiff and her family members with knowledge about the health hazards associated with exposure asbestos and how to eliminate, reduce or minimize such hazards;

(c)    Failing to conduct on-site personnel training sessions for their employees, servants, agents and contractors, which should have been designed to provide said individuals with knowledge about the health hazards associated with exposure asbestos and how to eliminate, reduce or minimize such hazards;

(d)    Failing to adequately test, research, investigate and inspect their products, activities and/or premises as to the asbestos hazards associated therewith and failing thereafter to provide the results of such tests, research, investigations and inspections to exposed individuals, such as Plaintiff and her family members;

(e)    Failing to inspect the workplaces at which their products were being used to determine whether the products were deleterious to the health of those exposed, including family members of those directly exposed;

(f)     Failing to design, manufacture, handle, apply or otherwise place in the stream of commerce asbestos products in a manner intended to eliminate, reduce or minimize exposure during reasonably foreseeable uses;

(g)     Failing to employ, recommend, supply or otherwise provide necessary engineering controls, work practices and other industrial hygiene controls;

(h)     Failing to recall their defective products or utilize a reasonably safe alternative;

(i)     Failing to take adequate precautions and industrial hygiene measures to protect Plaintiff and her family members when handling asbestos products, including, but not limited to, providing protection from dust and fibers emanating from the installation, repair and/or removal process; failing to use local ventilation; failing to provide warnings or instruction to Plaintiff, her family members and workers in the facilities at issue, including Talc Product Retailer Defendants' and Automobile Repair Defendants' premises, that exposure to asbestos is hazardous and carcinogenic; failing to adequately clean up debris from the installation, repair and/or removal process; failing to use wet-down procedures; and/or failing to take other appropriate safety and industrial hygiene measures;

(j)     Failing otherwise to act reasonably under the totality of the circumstances.

227.    Defendants manufactured, supplied, distributed, sold or otherwise placed into the stream of commerce asbestos products that were utilized at Plaintiff's father's worksites, including, but not limited to, Automobile Repair Defendants' premises. Consequently, Defendants had a duty to warn individuals, including, but not limited to, Plaintiff and her father, of the dangers associated with the exposure to asbestos from Defendants' products, activities and/or premises.

228.    Despite Defendants' knowledge of the health hazards associated with asbestos, they acted unreasonably in failing to provide adequate warnings and/or instructions regarding same.

229.    At the time Defendants' asbestos products left their control without adequate warning or instruction, Defendants created an unreasonably dangerous condition that they knew or should have known would pose a substantial risk of harm to a reasonably foreseeable claimant, such as the Plaintiff. In the alternative, after Defendants' products left their control, Defendant became aware of or, in the exercise of ordinary care, should have known that their products posed a substantial risk of harm to reasonably foreseeable users, those working in their vicinity and their family members, and failed to take reasonable steps to give adequate warning or instruction or to take any other reasonable action under the circumstances.

230.    Defendants' failure to provide adequate warnings as to the hazards associated with exposure to asbestos or to provide proper instructions on the use, handling and storage of asbestos materials and products caused Plaintiff to develop mesothelioma as a consequence of which she has been injured and damaged and claims damages from the Defendant jointly and severally.

231.    Defendants acted unreasonably in failing to provide warnings or instructions, or adequate warnings or instructions, and said failure was a proximate cause of the harm for which damages are sought. Additionally, at the time Defendants' products left their control, the products, without adequate warnings or instructions, created an unreasonably dangerous condition that Defendants knew or, in the exercise of ordinary care, should have known posed a substantial risk of harm to Plaintiff; and/or after Defendants' products left their control, Defendants became aware or, in the exercise of ordinary care, should have become aware that the products posed a substantial risk of harm to Plaintiff, and they failed to take reasonable

steps to give adequate warnings or instructions or to take other reasonable action under the circumstances.

232. As a result of the Defendants' failure to warn, Plaintiff suffered and will continue to suffer the damages hereinafter alleged.

## TENTH CAUSE OF ACTION:
### FAILURE TO WARN
**(Against Automobile Repair Defendants)**

233. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

234. At all times material hereto, the Automobile Repair Defendants knew and should have known that various automotive parts, including, without limitation, gaskets, mufflers, brake linings, and clutch discs, contained asbestos.

235. At all times material hereto, the Automobile Repair Defendants knew and should have known of the health hazards associated with asbestos exposure.

236. Automobile Repair Defendants had a duty to warn individuals present at their premises, including, but not limited to, Plaintiff and her father, of the dangers associated with exposure to asbestos from automotive parts.

237. Despite Automobile Repair Defendants' knowledge of the health hazards associated with asbestos exposure:

(a)     Failed to properly enclose, encapsulate, seal, contain and/or safeguard the premises in and around asbestos-containing automotive parts in order to prevent the release into the surrounding area of asbestos;

(b)     Failed to properly warn Plaintiff and her father of the presence of asbestos that had been released in the air as a direct and proximate result of the Automobile Repair Defendants and/or their employees, agents and/or servants;

(c)     Failed to properly label areas of the premises regarding to the existence of friable or potentially friable asbestos-containing automotive parts;

(d)     Failed to take reasonable precautions to publish, disseminate or otherwise make available to Plaintiff and her father warnings or information regarding the dangerous nature of asbestos-containing automotive parts utilized at the premises;

(e)     Failed to implement or disseminate any reasonable plan to protect Plaintiff and her father from exposure to asbestos at the Automobile Repair Defendant's premises; and

(f)     Failed to otherwise act reasonably under the totality of the circumstances.

238.    Despite their knowledge of the health hazards of asbestos, Automobile Repair Defendants acted unreasonably in failing to provide adequate warnings and instructions as to the health hazards associated with exposure to asbestos.

239.    As a direct and proximate result of the Automobile Repair Defendants' failure to warn, Plaintiff suffered and will continue to suffer the irreparable harm, injury, and damages, as described herein.

## ELEVENTH CAUSE OF ACTION:
## CIVIL CONSPIRACY
**(Against Talc Defendants; Talc Product Retailer Defendants; and PCPC)**

240.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

241. In furtherance of a common scheme, Talc Defendants, Talc Product Retailer Defendants and PCPC, along with third parties, entered into agreements among and/or between themselves to prevent, avert, block, hamper, repeal, limit, suppress, alter, impair, subvert, undermine and/or corrupt medical literature, scientific literature, industry knowledge, government knowledge, public knowledge, regulations and laws regarding asbestos in products containing talc and the health hazards associated with asbestos and talc.

242. Talc Defendants', Talc Product Retailer Defendants' and PCPC's conspiracy caused Plaintiff to unwittingly suffer asbestos exposure from Talc Defendants' and Talc Product Retailer Defendants' products.

243. Talc Defendants', Talc Product Retailer Defendants' and PCPC's conspiracy was a proximate result of Plaintiff's injuries and damages sought herein.

**TWELFTH CAUSE OF ACTION:**
**GROSS NEGLIGENCE—WILLFUL, WANTON, AND RECKLESS CONDUCT**
**(Against All Named Defendants)**

244. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

245. Defendants have known or should have known since at least the early 1900s of medical and scientific data which clearly indicated that asbestos, asbestos products and exposure to asbestos presented a serious health hazard.

246. Despite the aforementioned knowledge, Defendants, individually and collectively, and prompted and motivated by pecuniary concerns, ignored and failed to act upon said medical and scientific data and conspired to deprive the public, including Plaintiff,

of said medical and scientific data, depriving them of the opportunity of free choice as to whether or not to expose themselves to asbestos from Defendants' products and/or activities. As a result, Plaintiff has been severely damaged as is set forth herein.

247. Defendants intentionally and fraudulently continued to conceal the hazards of asbestos exposure from the early 1900s through the present, thus denying Plaintiff the knowledge with which to take necessary safety precautions, such as periodic medical examinations and avoiding further asbestos exposure. Specifically, Defendants' intentional and fraudulent conduct included the following acts and omissions:

(a) Failing to warn users when Defendants had knowledge of the need for monitoring due to prior exposure;

(b) Failing to recall their products;

(c) Suppressing relevant publication and circulation of articles and literature pertaining to the health hazards of asbestos from the 1930's through the present;

(d) Failing to recall, modify, replace or otherwise remediate their asbestos products and/or activities that generated asbestos dust due to pecuniary interests; and

(e) Failing to warn, or adequately warn, users and visitors of the hazards of asbestos from Defendants' products and/or activities.

248. Defendants' acts and failures to act, as herein set forth, were intentional, willful and done with willful disregard of the safety of Plaintiff, her family members and others similarly situated at a time when Defendants had knowledge, or should have had knowledge, of the serious health hazards associated with asbestos exposure, and even though forewarned by tests, standards, rules and regulations, statutes and ordinances, Defendants nevertheless placed into the stream of commerce and/or utilized for their own profit hazardous asbestos

materials, products and/or equipment with full knowledge that it was being used and would be used in the future to the detriment of the health of Plaintiff and others similarly situated.

249. Under the circumstances, Defendants engaged in fraudulent or willful and wanton conduct within the meaning of N.C. Gen. Stat. § 1D-5(4) & (7) and N.C. Gen. Stat. § 15 and engaged in acts and omissions giving rise to one or more aggravating factors within the meaning of N.C. Gen. Stat. § 1D-15 and N.C. Gen. Stat. § 1D-35.

250. On information and belief, Defendants' relevant officers, directors, or managers participated in or condoned the conduct constituting the aggravating factor justifying punitive damages, within the meaning of N.C. Gen. Stat. § 1D-15(c).

251. Accordingly, as a result of the Defendants' conduct in which they acted in willful, wanton, grossly negligent and in total disregard for the health and safety of the user, consumer and/or visitor, such as Plaintiff, Plaintiff seeks exemplary and punitive damages against Defendants to punish them for their actions, which were willful, wanton, gross and in total disregard of the health and safety of the users and consumers of their products and/or visitors to their premises.

## DAMAGES

252. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

253. As a result of the development of asbestos-related malignant mesothelioma, Plaintiff has suffered and sustained very serious injuries to her person.

254.     Plaintiff has suffered great pain, extreme nervousness, and mental anguish as a direct result of the aforesaid injuries.

255.     Plaintiff verily believes that her injuries and illnesses are recurrent in nature and that she will be forced to suffer same for the remainder of her life; that her enjoyment of life has been greatly impaired; she has lost wages due to her illness; that she may be forced to leave her employment due to her poor health, resulting in substantial lost wages and loss of earning capacity; and that her expected life span has been greatly shortened.

256.     Plaintiff alleges that as a result of the aforesaid illnesses she has been forced to incur large amounts of medical expenses and other expenses related to her medical care and treatment, and she verily believes that she will be forced to incur additional expenses in the future.

WHEREFORE, the Plaintiff verily believes she is entitled to actual damages against the Defendants, jointly and severally, by reason of the foregoing causes of action, lost wages, special damages, and punitive damages in an amount to be determined by the trier of fact, plus the costs of this action.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury of all claims and causes of action that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter a judgment finding and ordering as follows:

A.    awarding Plaintiff all actual, compensatory and other damages to which Plaintiff is entitled by law;

B.    awarding the Plaintiff punitive damages;

C.    awarding any costs, fees and expenses, and pre-judgment and post-judgment interest, as may be allowable by law; and

D.    awarding such other and further relief as this Court may deem just and proper.


Respectfully submitted, this the 1st day of March, 2017.

**WALLACE AND GRAHAM, P.A.**

/s/William M. Graham
William M. Graham (NC Bar No. 17972)
Edward L. Pauley (NC Bar No. 27060
Michael B. Pross (NC Bar No. 27050)
John Hughes (NC Bar No. 22126)
Attorneys for Plaintiff
525 North Main Street
Salisbury, NC 28144
Tel. No. (704) 633-5244
Fax: (704) 633-9434
bgraham@wallacegraham.com
epauley@wallacegraham.com
mpross@wallacegraham.com
jhughes@wallacegraham.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

## SERVICE LIST

American Honda Motor Co. Inc.
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

Auto Generator & Starter Service Inc.
c/o Eddy Steve Squires
2324 Stallings Drive
Kinston, NC 28501

Avon Products Inc.
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

Barnes Motor & Parts Co. Inc. (f/k/a Barnes Motor Co.)
c/o Henry H. Waltson IV
2728 Forest Hills Rd. SW
Wilson, NC 27894

BMW of North America LLC
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

Bobbi Brown Professional Cosmetics Inc.
575 Broadway, 4th Fl.
New York, NY 10012

BorgWarner Morse TEC LLC
c/o The Corporation Trust Co.
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

Brenntag Specialties Inc. (f/k/a Mineral and Pigment Solutions Inc. and Whittaker, Clark
    & Daniels Inc.)
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

British American Tobacco PLC (d/b/a Yardley and as successor to Yardley & Co. Ltd.)
Globe House
4 Temple Place
London
WC2R 2PG
United Kingdom

Britain's Garage LLC
c/o Lee Jennings Yarborough
2909 Fox Run Circle
Kinston, NC 28504

Clinique Laboratories LLC
110 E. 59th St.
New York, NY 10022
-AND-
c/o Corporation Service Co.
80 State St.
Albany, NY 12207

Colgate-Palmolive Co.
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

ConAgra Brands Inc. (f/k/a ConAgra Foods Inc., individually and as successor to
    Beatrice Foods Co.; Esmark Inc.; and International Playtex Inc.)
c/o The Prentice-Hall Corporation System Inc.
327 Hillsborough St.
Raleigh, NC 27603

Continental Automotive Systems Inc. (f/k/a Continental Teves Inc.)
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

Cyprus Amax Minerals Co.
c/o Corporation Service Co.
2711 Centerville Rd., Ste. 400
Wilmington, DE 19808

Dan Wise Chevrolet Inc.
c/o Daniel W. Wise
6595 Hwy. 70 West
La Grange, NC 28551

Dana Companies LLC
c/o CT Corporation System
4701 Cox Rd., Ste. 285
Glenn Allen, VA 23060

Doug Henry Chevrolet Buick GMC Inc. (f/k/a Doug Henry Chevrolet Buick Pontiac
      GMC Truck Inc. and Doug Henry Chevrolet Buick Pontiac GMC Inc.)
c/o Doug Henry
809 W. Wilson St.
Tarboro, NC 27886

Doug Henry Chevrolet Inc. (f/k/a Doug Henry Chevrolet Oldsmobile Inc.)
c/o Doug Henry
809 W. Wilson St.
Tarboro, NC 27886

Edgewell Personal Care Co. (individually and as successor to Playtex Products Inc., f/k/a
      Playtex FP Group Inc., individually and as successor to Playtex Family Products
      Corp. and Playtex Holdings Inc.)
c/o CT Corporation System
120 South Central Ave.
Clayton, MO 63015

Edgewell Personal Care LLC (f/k/a Energizer Personal Care LLC, individually and as
      successor to Playtex Products Inc., f/k/a Playtex FP Group Inc., individually and as
      successor to Playtex Family Products Corp. and Playtex Holdings Inc.)
c/o CT Corporation System
120 South Central Ave.
Clayton, MO 63015

Estée Lauder Inc.
c/o Corporation Service Co.
2711 Centerville Rd., Ste. 400
Wilmington, DE 19808

Frema Motors Inc.
c/o Steve F. Lafevers
1112 Sunburst Dr.
Goldsboro, NC 27534

Ford Motor Co.
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

Gene Taylor Inc. (f/k/a Gene Taylor Chevrolet Inc. and Gene Taylor Chevrolet-GMC
    Inc.)
c/o David L. Ward Jr., Esq.
Ward & Smith PA
1001 College Ct.
New Bern, NC 28560

Genuine Parts Co.
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

Hennessy Industries Inc.
c/o The Corporation Trust Co.
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

Honeywell International Inc. (f/k/a Allied Signal Inc., as successor to the Bendix Corp.)
c/o Corporation Service Co.
327 Hillsborough St.
Raleigh, NJ 27603

Imerys Talc America Inc. (f/k/a Luzenac America Inc.)
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

84

L'Oreal SA (individually and as successor to The Maybelline Co. and Maybelline Inc.)
10 Hudson Yards
New York, NY 10001

L'Oreal USA Creative Inc. (d/b/a Maybelline and f/k/a Maybelline Cosmetics Corp.,
    individually and as successor to The Maybelline Co. and Maybelline Inc.)
10 Hudson Yards
New York, NY 10001

L'Oreal USA Inc. (f/k/a Cosmair Inc.)
10 Hudson Yards
New York, NY 10001

Maremont Corp.
c/o The Corporation Trust Co.
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

Massey Motor Co.
c/o Randolph G. Kelley
4760 Hwy. 70 West
Kinston, NC 28501

Maybelline LLC
c/o Corporation Service Co.
80 State St.
Albany, NY 12207

Mitsubishi Motors North America Inc.
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

National Automotive Parts Association Inc.
c/o The Corporation Co.
40600 Ann Arbor Rd. E., Ste. 201
Plymouth, MI 48170

Navistar Inc. (f/k/a International Truck and Engine Corp.)
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

Nissan North America Inc.
c/o Corporation Service Co.
327 Hillsborough St.
Raleigh, NJ 27603

Paul Benton Motors of North Carolina LLC (individually and as successor to Gene
    Taylor Inc.; Gene Taylor Chevrolet Inc.; and Gene Taylor Chevrolet-GMC Inc.)
c/o National Corporate Research Ltd.
212 South Tyron St., Ste. 1000
Charlotte, NC 28281

Personal Care Products Council (f/k/a Cosmetics, Toiletries, and Fragrance Association)
1620 L St. NW, Ste. 1200
Washington, DC 20036

Playtex Products LLC (individually and as successor to Playtex Products Inc., f/k/a
    Playtex FP Group Inc., individually and as successor to Playtex Family Products
    Corp. and Playtex Holdings Inc.)
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

R&S Automotive
2384 US 258
Kinston, NC 28504

R&S Automotive Service LLC
c/o Sherry E. Shearer
2439 Pineridge Dr.
Kinston, NC 28504

Revlon Inc.
c/o Corporation Service Co.
2711 Centerville Rd., Ste. 400
Wilmington, DE 19808

Revlon Consumer Products Corp.
c/o Corporate Creations Network Inc.
15720 Brixham Hill Ave., Ste. 300
Charlotte, NC 28277

Sale Auto Mall Inc. (f/k/a Sale Chevrolet, Buick, BMW Inc. and Sale Chevrolet-BMW
    Inc.; and as successor to Poole Buick Co. Inc.)
c/o Daniel K. Sale
1611 Cambridge Dr.
Kinston, NC 28504

Sale Automotive Group Inc.
c/o Daniel K. Sale
1611 Cambridge Dr.
Kinston, NC 28504

Sale Ford LLC
c/o Daniel K. Sale
1145 Hwy. 258 N.
Kinston, NC 28504

Standard Motor Products Inc.
c/o Lawrence I. Sills
37-18 Northern Blvd.
Long Island City, NY 11101

Tampbrands Inc.
c/o Corporation Trust Company
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

Target Corp.
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

Tilghman's Garage LLC
c/o Scott Tilghman
1104 Shetland Ct.
Raleigh, NC 27609

The Estée Lauder Companies Inc.
c/o Corporation Service Co.
2711 Centerville Rd., Ste. 400
Wilmington, DE 19808

The Gillette Co.
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

The Procter & Gamble Co. (individually and as successor to Yardley of London and The
    Gillette Company)
c/o CT Corporation System
1300 E. 9th St.
Cleveland, OH 44114

Toyota Motor Sales USA Inc.
c/o CT Corporation System
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

Walgreen Co.
c/o Corporation Service Co.
327 Hillsborough St.
Raleigh, NC 27603-1725

White Owl Parts Co. Inc.
c/o George Kivett Jr.
2539 Hillcrest Rd.
Kinston, NC 28504

Whittaker, Clark & Daniels Inc.
c/o Joseph K. Cobuzio, Esq.
Tompkins McGuire Wachenfeld & Barry LLP
Gateway One Center, Suite 615
Newark, NJ 07102
-AND-
c/o Joseph K. Cobuzio, Esq.
3 Becker Farm Rd., Ste. 402
Roseland, NJ 07068

Winner Chevrolet Inc.

c/o Roland L. Paylor III
6246 NC Hwy. 11 S
Ayden, NC 28513

Wynn Odom Ford Inc.
c/o Wynn K. Odom
4743 E. Washington St.
La Grange, NC 28551