# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JODY RATCLIFF,

                    Plaintiff,

    v.                                                      1:17CV174

AMERICAN HONDA MOTOR CO. INC.,
et al.,

                    Defendants.

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on a Motion for Summary Judgment on Statute of Limitations [Doc. #475] by Defendants Ford Motor Company (Ford), Brenntag Specialties, Inc. (BSI), and Whittaker, Clark & Daniels Inc. (WCD), and a Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 [Doc. #468] by Defendant Honeywell International, Inc.[1]

With respect to the statute of limitations defense, Defendants contend that the three-year statute of limitations began to run on May 5, 2005, when Plaintiff Jody Ratcliff was first diagnosed with a form of mesothelioma, and that the statute of limitations therefore expired several years before she filed the March 1, 2017 Complaint in this case. Plaintiff argues that the statute of limitations did not accrue until April 2014, which is when she alleges she knew or had reason to know that her disease had progressed to another sub-type of mesothelioma.

---

[1] Cyprus Amax Minerals Company (Cyprus) originally joined in the Motion for Summary Judgment [Doc. #475], but subsequently settled with Plaintiff, and the claims and motions involving Cyprus will be terminated as moot in light of the Notice of Settlement.

As discussed below, the Court concludes that there are no genuine issues of material fact as to the statute of limitations, and there is no evidence on which a jury could find that Plaintiffs' claims in the present case are timely. Therefore, the Court will recommend that the Statute of Limitations Motion for Summary Judgment be granted and that Defendant Honeywell's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 be granted as it relates Honeywell's statute of limitations defense.

The Court notes that there are also several other pending Motions: Defendant Ford has filed Daubert Motions to exclude the expert opinion testimony of Dr. David Rosner, Dr. Carlos Bedrossian, and Dr. Arnold Brody, and a related Motion for Summary Judgment Pursuant to Rule 56 [Doc. #461, #467, and #471]. Defendant Honeywell has filed a Daubert Motion to Exclude the Expert Opinion Testimony of Dr. Carlos Bedrossian [Doc. #463]. Defendant WCD has filed Daubert Motions to Exclude Specific Causation Opinions and Cumulative Exposure Opinion as Evidence of Causation and a related Motion for Summary Judgment [Doc. #465, #472, and #477]. Defendant BSI has filed a Motion for Partial Summary Judgment and a Motion to Bifurcate [Doc. #486 and #491]. As a result of this Court's recommendation that summary judgment be granted on the statute of limitations, the Court will recommend that these remaining pending Motions be terminated as moot.

I.   FACTS, CLAIMS, AND PROCEDURAL HISTORY

In this case, Plaintiff Jody Ratcliff filed a twelve-count Complaint on March 1, 2017, against sixty-two (62) defendants alleging injury caused by exposure to asbestos-containing products. (Compl. [Doc. #1].) Ms. Ratcliff asserts claims of negligence, gross negligence, inadequate design, breach of warranty, product liability, premises liability, fraud/false

2

representation, and conspiracy against a number of automotive repair shops, retailers, and businesses in the automotive or beauty retail industry. The Complaint divides the Defendants into various groups: the "Friction Defendants," the "Talc Defendants," the "Retailer Defendants," the "Talc Product Retailer Defendants," and the "Automobile Repair Defendants." Most of the Defendants have settled or otherwise been dismissed, and the remaining Defendants are Ford, BSI, WCD, and Honeywell.[2]

As the basis for her claims, Plaintiff contends that her father, Oden Ratcliff, worked as a tool salesman, and that during the summers of 1987–1989, she visited automotive garages and dealerships alongside her father, that she was a bystander in the garages while brake work was performed, and that as a result she was exposed to dust from asbestos-containing brakes and related products. Plaintiff also contends that between 1977 and 2016, she used talc products that allegedly contained asbestos, including baby powder, deodorant, and makeup.

Plaintiff began experiencing abdominal symptoms in 2004 and underwent various imaging and testing, including a diagnostic laparoscopic procedure in 2005. As a result of the biopsy, she was diagnosed with well-differentiated papillary mesothelioma ("WDPM") on May 5, 2005, by Dr. Jason Pereira at Vanderbilt University Medical Center. In his deposition in this case, Dr. Pereira confirmed that Plaintiff had "a form of cancer," and explained that

---

[2] Defendants Ford and Honeywell are identified as two of the "Friction Defendants," a group that allegedly "mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce automotive products, materials and/or equipment containing asbestos to which Plaintiff was directly and indirectly exposed in North Carolina between 1985 and approximately 2004." (Compl. ¶ 9.) BSI and WCD are identified as two of the "Talc Defendants," a group that allegedly "mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing talc, cosmetic and/or personal hygiene products—including raw and processed talc, makeups, deodorants and/or tampons—that contained asbestos to which Plaintiff was directly and indirectly exposed in North Carolina and elsewhere between approximately February 14, 1977, and 2016." (Compl. ¶ 10.)

mesothelioma is "a malignancy of the lining of the abdomen or the thorax," that in Plaintiff's case the malignancy was of the peritoneal cavity (the lining of the abdomen), and that WDPM is "one variant" of mesothelioma. (Pereira Dep. at 53–54, 88-89 [Doc. #476-2 at 15, 23-24].)[3]

Following her diagnosis, Ms. Ratcliff sought a second opinion from specialists at MD Anderson Cancer Center. (MD Anderson Rep. [Doc. #518-3].) The MD Anderson Report dated June 20, 2005, reflects that "[i]n most of the area, the tumor [had] a pattern similar to a well-differentiated papillary mesothelioma," but that "invasion into the adipose tissue is seen" with diagnosis of "Malignant Mesothelioma, Epithelial Type." (MD Anderson Rep. [Doc. #518-3].) In her deposition, Plaintiff testified that she did not receive a copy of this Report, but that she received a call from MD Anderson that confirmed her diagnosis of WDPM. (J. Ratcliff Dep. Dec. 13, 2016 at 196-198; Feb. 14, 2017 at 236 [Doc. #476-3 at 52-53, 311].)

Dr. Pereira referred Plaintiff to an oncologist, Dr. Carbone. (Pereira Dep. [Doc. #476-2] at 62.) Plaintiff confirmed that she saw Dr. Carbone on May 26, 2005, and that Dr. Carbone said that it was "okay to manage this [by] just following it with CAT scans [and] if or when symptoms come back, then treating it at that point," and that at some point she would need "treatment or surgery." (J. Ratcliff Dep. Feb. 15, 2017 at 325-27 [Doc. #476-3 at 243-44].) Plaintiff also testified that she remembered Dr. Carbone saying, "welcome to the league of cancer survivors." (J. Ratcliff Dep. Feb. 15, 2017 at 325 [Doc. #476-3 at 243].)

---

[3] One of Plaintiff's later treating physicians, Dr. Edward Levine, explained that well-differentiated papillary mesothelioma is "a malignant tumor arising from the mesothelium, which is the peritoneal [abdominal] lining. . . . That malignant tumor, it comes in several varieties. Well-differentiated refers to the histological grade and papillary describes what it looks like under the microscope." (Levine Dep. at 20-21 [Doc. #476-5 at 8].)

At the time of her diagnosis in 2005, Ms. Ratcliff worked at Vanderbilt University Medical Center as an ICU Nurse. (J. Ratcliff Dep. Dec. 13, 2016 at 33 [Doc. #476-3 at 11].) Following the diagnosis, Plaintiff performed research regarding her condition, using the internet and publication databases that she had access to as part of her position as a nurse. Plaintiff recalled that researching WDPM led her to "general mesothelioma sites that had discussion about asbestos and causes." (J. Ratcliff Dep. Dec. 14, 2016 at 284 [Doc. #476-3 at 76].) She stated that she conducted an internet search "to try to find information about WDPM," and that "mesothelioma and asbestos" was "one of the bigger hits." (See J. Ratcliff Dep. Dec. 20, 2016 at 566 [Doc. #476-3 at 148].) Plaintiff also recalled that she was directed to a telephone number during her research, that she called the number to get more information about her condition, and that the number directed her to an attorney handling asbestos-exposure mesothelioma cases. (See J. Ratcliff Dep. Dec. 14, 2016 at 288; Dec. 20, 2016 at 567-568 [Doc. #476-3 at 77, 149].) Plaintiff discussed her case with someone at the number, but according to Plaintiff, they told her that she did not have a case. (Id.)

Ms. Ratcliff moved to North Carolina soon thereafter, and was followed with frequent CT scans at Duke Medical Center. She later moved to Seattle, Washington. In 2009 and 2010, she began to experience more symptoms, including fluid in her abdomen (ascites) and an increase in the tumor bulk in her abdomen. Sometime in 2009 or 2010, she contacted another attorney to discuss WDPM and whether there was a cause of action for asbestos exposure. (J. Ratcliff Dep. Dec. 13, 2016 at 103-104; Dec. 23, 2016 at 569; Feb. 14, 2017 at 244-45 [Doc. #476-3 at 29, 149, 313].) However, according to Plaintiff, that attorney also told her that she did not have a case. (Id.)

In April 2010, Ms. Ratcliff went to see Dr. Thomas Malpass, an oncologist at Virginia Mason Medical Center ("VMMC") in Seattle. Dr. Malpass' Report reflects a diagnosis of "Indolent primary peritoneal malignancy (well differentiated papillary mesothelioma)." (Levine Dep. Ex. 3 [Doc. #476-5 at 32-34].) Dr. Malpass referred Ms. Ratcliff to Dr. Edward Levine at Wake Forest Baptist Medical Center. (See Levine Dep. Ex. 2 [Doc. #476-5 at 28-31].) At the initial evaluation on October 15, 2010, Dr. Levine noted that Ms. Ratcliff was being seen for "evaluation of peritoneal mesothelioma with malignant ascites.[4]" (Levine Dep. Ex. 2 [Doc. #476-5 at 28-30].) Dr. Levine noted that Ms. Ratliff had been diagnosed with peritoneal mesothelioma in 2005, had been followed with frequent imaging, had been relatively asymptomatic until early in 2010 when she started developing abdominal distention, had proceeded with procedures (paracentesis) in June and September 2010 to remove fluid from her abdomen, was continuing to experience symptoms, and was now inquiring about cytoreductive surgery[5] and intraperitoneal chemotherapy.[6] (Levine Dep. Ex. 2 [Doc. #476-5 at 28-30].) Dr. Levine confirmed a diagnosis of peritoneal mesothelioma and performed cytoreductive surgery with intraperitoneal chemotherapy in November 2010. (Levine Dep. at 37, 43-44 [Doc. #476-5 at 12, 14]; Operative Report, Levine Dep. Ex. 6 [Doc. #476-5 at 38-41].) The surgical pathology report following the November 2010 surgery reflects a diagnosis

---

[4] Dr. Levine explained that acites refers to fluid accumulating in Plaintiff's abdomen. (Levine Dep. at 23 [Doc. #476-5 at 9].)

[5] Cytoreductive surgery is an operation to reduce the volume or bulk of a tumor. (Levine Dep. at 31–32 [Doc. #476-5 at 11].)

[6] Hyperthermic intraperitoneal chemotherapy refers to chemotherapy that is delivered directly into the abdomen at an elevated temperature during a tumor reduction operation. (Levine Dep. at 32 [Doc. #476-5 at 11].)

of well-differentiated papillary mesothelioma (Pl. Resp. Ex. 6 [Doc. #518-6 at 3]), and the cytology report of the fluid reflects "malignant mesothelioma" (Levine Dep. Ex. 7 [Doc. #476-5 at 42].) Ms. Ratcliff attended a follow-up appointment with Dr. Levine on December 2, 2010, and was directed to return for regular follow-up. (Levine Dep. at 44-45 and Ex. 8 [Doc. #476-5 at 14, 43].) In her deposition, Mr. Ratcliff testified that when she had the 2010 surgery, Dr. Levine told her that she "had a lot of tumor bulk, and that he thought maybe I had about a year to live." (J. Ratcliff Dep. Dec. 20, 2016 at 572 [Doc. #476-3 at 150].)

Ms. Ratcliff continued to be seen by Dr. Malpass at VMMC in Seattle, and a record from VMMC reflects that Ms. Ratcliff was seen on November 8, 2013, with "well differentiated papillary mesothelioma status post radical debulking and intraperitoneal cisplatin done in November 2010, now with progressive and symptomatic disease." (Malpass Record [Doc. #476-5 at 46].) Dr. Malpass sent the record to Dr. Levine at Wake Forest to discuss whether a second surgery should be performed. Dr. Levine met with Ms. Ratcliff on December 27, 2013, and scheduled the second surgery. On March 3, 2014, Ms. Ratcliff underwent a second cytoreductive surgery with hyperthermic intraperitoneal chemotherapy. The surgical pathology report for that surgery reflects "Epithelioid mesothelioma." (Levine Dep. Ex. 14 [Doc. #476-5 at 60].) In his deposition, Dr. Levine explained that epithelioid mesothelioma is a "subtype of peritoneal mesothelioma" that is "[m]ore aggressive than the well-differentiated papillary type" but "is still peritoneal mesothelioma." (Levine Dep. at 57-58 [Doc. #476-5 at 17-18].)

Ms. Ratcliff was then referred to Dr. Hedy Kindler of the University of Chicago Medical Center. The April 30, 2014 progress note by Dr. Kindler reflects that Ms. Ratcliff

had "recurrent peritoneal epithelial mesothelioma, previously characterized as well differentiated papillary mesothelioma (WDPM) now characterized as epithelioid type…" (Kindler Diagnosis History [Doc. #518-7 at 5].) Ms. Ratcliff returned to VMMC's outpatient clinic on May 28, 2014. At this time, Dr. Gurkamal Chatta from VMMC noted that Dr. Kindler's review of the pathology from Ms. Ratcliff's March 3, 2014 surgery revealed "transitional malignancy from well-differentiated papillary mesothelioma to an epithelioid mesothelioma." (See Pl. Resp, Ex. 9 [Doc. #518-9 at 2].)

On July 26, 2016, Ms. Ratcliff filed suit in Washington state court for damages connected to her diagnosis of mesothelioma (Case No. 16-2-18128-7 SEA). Plaintiff later elected to take a voluntary dismissal of that case. (Defs. Reply [Doc. #542] at 3 n.2). Plaintiff filed her initial Complaint in the instant matter on March 1, 2017. In the present Motions for Summary Judgment [Doc. #468 & 475], the remaining Defendants contend, *inter alia*, that Plaintiff's Complaint was filed after the applicable statute of limitations period had expired.

## II.  STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Id. at 255. The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must then present specific facts demonstrating a genuine issue of material fact which requires trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When making a summary judgment determination, the court must view the evidence and draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 247. However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996); see also Anderson, 477 U.S. at 248-49. Moreover, a mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (citing Anderson, 477 U.S. at 248).

With respect to a statute of limitations defense, "[o]nce a defendant has properly pleaded the statute of limitations, the burden is then placed upon the plaintiff to offer a forecast of evidence showing that the action was instituted within the permissible period after the accrual of the cause of action." Faulise v. Smithkline Beecham Corp., 5:05CV200, 2006 WL 2229001, at *4 (W.D.N.C. Aug. 2, 2006) (internal quotations omitted). To the extent that the statute of limitations is raised at summary judgment, "[i]n general the question of whether a cause of action is barred by the statute of limitations is a mixed question of law and fact," but "[w]here the statute of limitations is properly pleaded, and the facts with reference to it are not in conflict, the issue is a matter of law, and summary judgment is appropriate." Id. (internal quotations omitted).

III.     DISCUSSION

    A.     The Applicable Statute of Limitations

    Here, the parties do not dispute that the statute of limitations in this case is set out in

Section 1-52(5) of the North Carolina General Statutes, which provides that an individual has

three years to commence an action for injury to the person.  N.C. Gen. Stat. § 1-52(5).  The

parties also do not dispute that Plaintiff filed this suit on March 1, 2017, and that the claim is

untimely if the statute of limitations began to run before March 1, 2014.  The issue is therefore

whether Plaintiff has presented a genuine issue of material fact to support a finding that her

claim accrued after March 1, 2014.

    For cases involving latent injury, North Carolina General Statute § 1-52(16) provides

that the three-year statute of limitations for personal injury actions "shall not accrue until

bodily harm to the claimant . . . becomes apparent or ought reasonably to have become

apparent to the claimant, whichever event first occurs."  N.C. Gen. Stat. § 1-52(16); Stahle v.

CTS Corp., 817 F.3d 96 (2016).  However, for cases involving disease, the North Carolina

Supreme Court has explained that:

> A disease presents an intrinsically different kind of claim. Diseases such as
> asbestosis, silicosis, and chronic obstructive lung disease normally develop over
> long periods of time after multiple exposures to offending substances which are
> thought to be causative agents. It is impossible to identify any particular
> exposure as the "first injury." Indeed, one or even multiple exposures to an
> offending substance in these kinds of diseases may not constitute an injury. **The
> first identifiable injury occurs when the disease is diagnosed as such, and
> at that time it is no longer latent** . . . .
>
> . . . .
>
> By this treatment of occupational disease claims, the legislature and the Court
> have recognized that exposure to disease-causing agent is not itself an injury.
> The body is daily bombarded by offending agents. Fortunately, it almost always

10

is capable of defending itself against them and remains healthy until, in a few cases, the immune system fails and disease occurs. That, in the context of disease claims, constitutes the first injury. Although persons may have latent diseases of which they are unaware, it is not possible to say precisely when the disease first occurred in the body. **The only possible point in time from which to measure the "first injury" in the context of a disease claim is when the disease is diagnosed. When the disease is diagnosed, it is no longer latent.**

Wilder v. Amatex Corp., 314 N.C. 550, 336 S.E.2d 66 (N.C. 1985) (emphasis added); see also

Dunn v. Pacific Employers Ins. Co., 332 N.C. 129, 132, 418 S.E.2d 645, 647 (N.C. 1992)

("Section 1–52(16) of the North Carolina General Statutes requires that a personal injury

action be brought within three years from the date 'bodily harm to the claimant . . . becomes

apparent or ought reasonably to have become apparent to the claimant, whichever event

occurs first.' In occupational disease cases, such as the instant case, a cause of action grounded

in negligence accrues when the disease is diagnosed."); Stahle, 817 F.3d at 110 ("North

Carolina law is settled that disease is not a latent injury; instead, the legal injury and awareness

of that injury occur simultaneously at diagnosis.").

Once the clock on the statute of limitations is triggered, subsequent aggravation of the

plaintiff's condition will not alter the date of accrual. See Keith v. U.S. Airways, Inc., 994 F.

Supp. 692, 695 (M.D.N.C. 1998) (applying North Carolina Law and holding that "Plaintiff's

claims thus accrued no later than when she was diagnosed with her repetitive stress disorders.

Any subsequent aggravation of her condition does not alter the date of accrual." (citation

omitted)); Faulise, 2006 WL 2229001, at *5 ("Although Plaintiff contends that Ms. Faulise's

congestive heart failure was not discovered until August 2002, North Carolina law is clear that

the worsening of Ms. Faulise's condition does not create a new limitations period. In sum, as

soon as plaintiff's injury became apparent, or ought reasonably to have become apparent, [her]

cause of action accrued. . . . The fact that further damage which plaintiff did not expect was discovered does not bring about a new cause of action, it merely aggravates the original injury." (internal quotation omitted)); see also Hussey v. Montgomery, 114 N.C. App. 223, 227-28, 441 S.E.2d 577, 579 (holding that where Defendant fell and injured his head as a result of Defendant's negligence, the statute of limitations began to run on that date, even though Defendant was not aware of the extent of his injuries including brain damage, and even though he was told by hospital personnel that there would not be brain damage); Robertson v. City of High Point, 129 N.C. App. 88, 91, 497 S.E.2d 300, 302 (N.C. Ct. App. 1998) ("Additionally, N.C. Gen. Stat. § 1–52(16) provides that an action for physical damage to claimant's property shall not accrue until it becomes apparent or ought reasonably to have become apparent to claimant. The primary purpose of N.C. Gen. Stat. § 1–52(16) is that it is intended to apply to plaintiffs with latent injuries. However, where plaintiffs clearly know more than three years prior to bringing suit about damages, yet take no legal action until the statute of limitations has run, the fact that further damage is caused does not bring about a new cause of action." (internal citation omitted)).

B.    Date of Diagnosis

It is undisputed that Ms. Ratcliff was diagnosed with well-differentiated papillary mesothelioma on May 5, 2005. Ms. Ratcliff nevertheless contends that there is a genuine issue of material fact because there is conflicting evidence regarding her exact diagnosis in 2005, that is, whether her mesothelioma was well-differentiated papillary mesothelioma or diffuse epithelioid mesothelioma. Plaintiff also contends that while she was informed of the diagnosis of well-differentiated papillary mesothelioma in 2005, she did not know of the diagnosis of

diffuse epithelioid mesothelioma until 2014. However, these contentions would only be material issues if well-differentiated papillary mesothelioma and diffuse epithelioid mesothelioma are separate and distinct illnesses. Plaintiff has not presented any evidence on which a jury could make that finding, and as explained below, all of the evidence reflects that WDPM and diffuse epithelioid mesothelioma are both subtypes of peritoneal mesothelioma.

Dr. Pereira, who diagnosed Plaintiff in 2005, explained in his deposition that Plaintiff had "a form of cancer," that mesothelioma is "a malignancy of the lining of the abdomen or the thorax," and that WDPM is "one variant" of mesothelioma. (Pereira Dep. at 53-54, 88-89 [Doc. #476-2 at 15, 23-24].) Dr. Pereira further explained that well-differentiated papillary mesothelioma is a "more benign variant" with "better prognosis" than epithelial type, but both are malignant cancerous conditions. (Pereira Dep. at 75-76 [Doc. #476-2 at 20].)

Similarly, the April 2010 report of Dr. Malpass, Plaintiff's oncologist in Seattle, reflects a diagnosis of "Indolent primary peritoneal malignancy (well differentiated papillary mesothelioma)." (Levine Dep. Ex. 3 [Doc. #476-5 at 34].) Dr. Malpass' report notes that Plaintiff's diagnosis was a "rare disease," that management was largely surgical, that Ms. Ratcliff was following a "typical pattern," and that "[t]hese patients can deteriorate into a more aggressive, more typical mesothelioma pattern and at that point may be benefited by systemic chemotherapy." (Id.)

After Plaintiff began experiencing more symptoms in 2010, including fluid in her abdomen requiring multiple procedures, Dr. Levine at Wake Forest began treating Plaintiff

and performed cytoreductive surgery with intraperitoneal chemotherapy in November 2010.[7]
She was in the hospital for eight days and was out of work for two months. (J. Ratcliff Dep.
Dec. 13, 2016 at 91-92 [Doc. #476-3 at 26].) In 2014, she underwent a second cytoreductive
surgery with hyperthermic intraperitoneal chemotherapy, and the surgical pathology report for
that surgery reflects "Epithelioid mesothelioma," which Dr. Levine explained is a "subtype of
peritoneal mesothelioma" that is "[m]ore aggressive than the well-differentiated papillary type"
but "is still peritoneal mesothelioma." (Levine Dep. at 57-58 [Doc. #476-5 at 17-18].) Dr.
Levine further explained that "[p]eritoneal mesothelioma has several subtypes" and "[o]ne of
those is the well-differentiated papillary." (Levine Dep. at 74-75 [Doc. #476-5 at 22].) Dr.
Levine confirmed that well-differentiated papillary mesothelioma "is a malignant condition"
and "is a cancer." (Levine Dep. at 21 [Doc. #476-5 at 8].) Dr. Levine confirmed that Plaintiff's
diagnosis did not change, that it was still peritoneal mesothelioma, and that only the sub-type
changed from well-differentiated papillary to epithelioid. (Levine Dep. 58-61 [Doc. #476-5 at
18].) Dr. Levine noted that Plaintiff's well-differentiated papillary mesothelioma "progressed,"
reflecting "the malignant process, the growth of uncontrolled or poorly controlled growth of
cells originating in the peritoneum." (Levine Dep. at 24-25, 28-29 [Doc. #476-5 at 9-10].) Dr.
Levine explained that "accumulations of mutations within the cells" caused the histological
sub-type to change. (Levine Dep. at 66 [Doc. #476-5 at 20].) Other treatment records
similarly reflect that Plaintiff's WDPM progressed or transitioned into diffuse epithelioid

---

[7] Plaintiff's expert Dr. Bedrossian described this as "the therapy of choice for peritoneal malignant mesothelioma." (Bedrossian Report at 17 [Doc. #476-8 at 18].) Dr. Levine explained that this procedure is performed on patients with "peritoneal metastases or peritoneal spread of an intra-abdominal malignancy." (Levine Dep. at 32-33 [Doc. #476-5 at 11].)

mesothelioma. (See, e.g., VMMC Record of Dr. Kinder evaluation [Doc. #518-9 at 2]; Dr. Malpass Record [Doc. #476-5 at 46].) Plaintiff herself contends that her WDPM "transformed," "transitioned," or "progressed" into diffuse epithelioid malignant mesothelioma. (Pl. Resp. [Doc. #518] at 3, 9, 10, 13).

Plaintiff's expert Dr. Bedrossian similarly notes that "[i]n 2010, you begin to see it transition between well-differentiated papillary mesothelioma and diffuse malignant peritoneal mesothelioma . . . [a]nd then in the last specimen in 2014, you see frank invasion . . . So you see a sequence of progression under the microscope." (Bedrossian Dep. Jan. 16, 2018 at 28 [Doc. #476-7 at 9].) Dr. Bedrossian noted that "the lesion is the same," and that it was "transitioning" to be more invasive over time. (Bedrossian Dep. March 6, 2019 at 33 [Doc. #476-4 at 10].) Dr. Bedrossian explained that he believes that "from the start, [WDPM] is a low malignant condition, a condition of low malignancy . . . but it's not fully manifest. And as it progresses, it becomes more and more evident that it becomes invasive." (Bedrossian Dep. Jan. 16, 2018 at 29 [Doc. #476-7 at 9].) In his report, Dr. Bedrossian explained that Plaintiff's "case of WDPM is pathologically considered a neoplasm with a low grade malignant potential, referred to also as borderline mesothelioma, and an attenuated malignant tumor." (Bedrossian Report at 7-8 [Doc. #476-8 at 8-9]). Dr. Bedrossian also noted that "this condition is part of the spectrum of asbestos-related mesothelioma" which is sometimes "picked up early," as in Plaintiff's case. (Bedrossian Dep. March 6, 2019 at 42-43 [Doc. #476-4 at 12].)

A case in this District previously considered a similar issue in 2008 in Stromberg v. Ashland, No. 1:07-CV-332, 2008 WL 11355372 at *1 (M.D.N.C. July 16, 2008). In that case,

15

the plaintiffs filed suit on April 25, 2007, alleging that Donald Stromberg was exposed to various solvents which caused his diagnosis of myelofibrosis on September 16, 2004, and rendered him disabled. About eight months after the commencement of the action, Mr. Stromberg developed and was diagnosed with acute myelogenous leukemia. Mr. Stromberg died from acute myelogenous leukemia in January 2008. Following Mr. Stromberg's death, an amended complaint was filed to assert a claim for acute myelogenous leukemia and for wrongful death, and to add ExxonMobil as a defendant. Id. ExxonMobil moved to dismiss the amended complaint as ExxonMobil had not been named as a defendant within three years of Mr. Stromberg being diagnosed with myelofibrosis. In opposition to ExxonMobil's motion to dismiss, the plaintiff argued that the statute of limitations accrued in or about December 2007 when Mr. Stromberg was diagnosed with acute myelogenous leukemia, which is the disease that ultimately lead to his death. Id. at *3. The plaintiff argued that acute myelogenous leukemia was a "new disease" that was separate and distinct from myelofibrosis and that allegedly manifested from the same chemical exposures. Id. The Court rejected the plaintiff's argument that the statute of limitations did not accrue until Mr. Stromberg's diagnosis of acute myelogenous leukemia was diagnosed, given the plaintiff's characterization that the myelofibrosis "developed into" and "transferred into" acute myelogenous leukemia. Id.

Similarly in this case, Ms. Ratcliff appears to suggest that the diagnosis she received in March 2014 of diffuse epithelioid malignant mesothelioma was a diagnosis of a new disease, and therefore the statute of limitations could not accrue until she received that diagnosis. However, this argument ignores the uncontroverted evidence, from her own treating physicians and her own expert, that diffuse epithelioid malignant mesothelioma was not a

diagnosis of a new illness, but rather reflected a progression of her peritoneal mesothelioma from one sub-type to another. Ms. Ratcliff does not argue that she continues to suffer from WDPM alongside diffuse epithelioid mesothelioma, and has not presented any evidence to support such a contention. In addition, the record reflects that while Plaintiff's condition initially progressed slowly, she was aware of the diagnosis in 2005, knew that she would need treatment in the future and would need to receive frequent scans and monitoring, and recalled her doctor welcoming her "to the league of cancer survivors." By 2010, she was experiencing significant symptoms, requiring multiple procedures to drain fluid from her abdomen, as well as surgery and intraperitoneal chemotherapy. She spent 8 days in the hospital and several months recovering. She recalls Dr. Levine telling her in 2010 that she likely had one year to live. (J. Ratcliff Dep. Dec. 20, 2016 at 572-573 [Doc. #476-3 at 150].) [8] She also testified that she understood that she had cancer cells in her abdomen as part of the WDPM diagnosis, and that the 2010 intraperitoneal chemotherapy was designed to kill cancer cells remaining after the tumor was removed. (J. Ratcliff Dep. Dec. 14, 2016 at 279-281 [Doc. #476-3 at 75-76].) There was no new or different disease in 2014, just a progression of her cancer, and Plaintiff presents no basis to conclude that progression of a prior cancer diagnosis would re-trigger the statute of limitations.[9]

---

[8] The Court also notes that Dr. Malpass' records from 2013 reflect that her previously indolent disease had become symptomatic requiring surgery in 2010 and then with continuing symptoms leading to a referral for further surgery in 2014, all prior to March 1, 2014. In addition, on February 26, 2014, Plaintiff signed a "North Carolina Baptist Hospital Informed Consent – Request for Operation" prior to undergoing her cytoreductive surgery which expressly stated, "I have been told by my physician that I have been diagnosed as having the following condition: peritoneal mesothelioma" (Levine Dep. at 54, Ex. 12 [Doc. #476-5 at 17, 53].) As such, Plaintiff herself acknowledged this diagnosis by February 26, 2014, and even using this date, Plaintiff's Complaint was untimely filed.

[9] The Court notes that some states, including Virginia, would not recognize a new accrual of the statute of limitations even if there were a separate and distinct diagnosis. See Joyce v. A.C. and S., Inc., 785 F.2d 1200

C.   Date of the Discovery of Cause

Plaintiff further contends that there is a genuine issue of material fact with respect to whether it was reasonable that she should have suspected prior to 2014 that her mesothelioma was caused by exposure to asbestos. Plaintiff contends that summary judgment is improper because a genuine question of fact exists as to "whether or not a reasonable person would suspect a wrongful cause under the same circumstances." (Pl. Resp. [Doc. #518] at 14). Plaintiff contends that it was not until her second cytoreduction surgery on March 3, 2014, that she became aware that she was injured in the legal sense. (See Pl. Resp. [Doc. #518 at 20]). In support of this contention, Plaintiff points to Black v. Littlejohn, in which the North Carolina Supreme Court determined that the discovery rule should be interpreted broadly so that the statute of limitations "does not begin to run until plaintiff discovers, or in the exercise of reasonable care, should have discovered, that he was injured as a result of defendant's wrongdoing." Black 312 N.C. 626, 642, 325 S.E.2d 469, 482 (1985); see also Markley v. Sulzer Metco, No. 4:11CV139, 2012 WL 13026999, at *1 (E.D.N.C. Feb. 28, 2012) ("Under N.C. Gen. Stat. 1-52(16), plaintiff's cause of action did not accrue, and therefore, the statute of limitations did not begin to run, until plaintiff should reasonably have discovered not only the existence of his illness, but also the cause of his illness.").

In the instant matter, Plaintiff was diagnosed with mesothelioma 2005. According to Plaintiff's expert witness Dr. Bedrossian, the link between low-grade asbestos exposure and

---

(4th Cir. 1985) (concluding that in an action for personal injury under Virginia law "there is but a single, indivisible cause of action for all injuries sustained," and the diagnosis of a separate and distinct illness would not trigger a new statute of limitations).  In the present case, as in Stromberg, the Court concludes that even if a diagnosis of a separate and distinct disease could trigger a new statute of limitations in North Carolina, Plaintiff here has not presented any evidence on which a jury could find that the progression of her peritoneal mesothelioma from one sub-type to another represented a separate and distinct disease.

peritoneal mesothelioma was fully established in 2005. (See Bedrossian Report at 16 [Doc. #476-8 at 17]; Bedrossian Dep. Jan. 16, 2018 at 46-47 [Doc. #476-7 at 14].) Dr. Bedrossian also noted that "pathologists have designated mesothelioma a 'signal tumor' for asbestos exposure, i.e, a neoplasm caused almost exclusively by asbestos exposure." (Bedrossian Report at 8 [Doc. #476-8 at 9] Bedrossian Dep. March 6, 2019 at 263, 269-72 [Doc. #476-4 at 67, 69].) Plaintiff also cites to numerous articles and reports to support her contention that there was a well-known causal link between asbestos exposure and mesothelioma, and to the extent that literature exists which suggests a causal link between asbestos exposure and peritoneal mesothelioma, these articles and reports were available at the time of Ms. Ratcliff's 2005 diagnosis.[10]

Indeed, Plaintiff acknowledges that after her initial diagnosis of WDPM in 2005, she conducted research and was led to mesothelioma sites that had "discussions about asbestos and causes." (J. Ratcliff Dep. Dec. 14, 2016 at 284 [Doc. #476-3 at 76]). She called a telephone number for information regarding her disease, which funneled her to a law firm handling

---

[10] Plaintiff contends that "very limited scientific literature discussing WDPM existed prior to 2005 and typically classified WDPM as 'benign.'" (Pl. Resp. [Doc. #518] at 12.) In support of this assertion, Plaintiff cites to the World Health Organization 2004 Classification of Tumours, specifically the chapter for paratesticular structures, which is found in the 2004 edition of WHO Classification of Tumours: Pathology and Genetics of Tumours of the Urinary System and Male Genital Organs. (Id.) However, it is unclear why Plaintiff points to the classification of tumors of the male genital organs. As noted by Defendants, the WHO chapter for tumors of the ovary and peritoneum found in the 2003 edition of WHO Classification of Tumours: Pathology and Genetics of Tumours of the Breast and Female Genital Organs actually provides that peritoneal malignant mesothelioma may be divided into "diffuse, well differentiated papillary and deciduoid types" and that "well differentiated papillary, diffuse epithelial and deciduoid mesotheliomas appear clinically related to asbestos exposure in some cases." (WORLD HEALTH ORG., WHO CLASSIFICATION OF TUMOURS: PATHOLOGY AND GENETICS OF TUMOURS OF THE BREAST AND FEMALE GENITAL ORGANS 197-99 (Tavassol, F. & Devilee, P. eds., 2003) [Doc. #476-6 at 2].) Plaintiff also cites to various other studies and publications, but Plaintiff does not contend that she saw or relied on any of these studies or publications, nor does Plaintiff point to any expert testimony with respect to those studies.

asbestos-exposure mesothelioma cases. (J. Ratcliff Dep. Dec. 14, 2016 at 288 [Doc. #476-3 at 77].) Plaintiff continued to research and in 2009 or 2010 she reached out to another attorney to discuss WDPM to "just see[ ] if there was any case as far as asbestos exposure and WDPM." (J. Ratcliff Dep. Feb. 14, 2017 at 244-245 [Doc. #476-3 at 313].) Plaintiff contends that in both encounters, the attorneys declined to take her case. However, as Defendants note, the statute of limitations is not tolled while a plaintiff looks for a lawyer who might be willing to take the case. Here, Plaintiff clearly had cause to suspect that her condition might be caused by asbestos – indeed, her internet searches about her disease led her to a law firm handling asbestos cases, and she later sought out a law firm to discuss the case.[11]

Plaintiff nevertheless contends that she was not reasonably on notice of the cause of her mesothelioma, given that her treating physicians did not inform her that her disease was related to asbestos exposure.[12] However, as noted by Defendants, Plaintiff's treating physicians still do not believe her mesothelioma was caused by asbestos exposure, based on the nature of the presentation and lack of any occupational exposure. (See, e.g., Levine Dep. at 26, 86-88 [Doc. #476-5 at 10, 25].) The fact that Plaintiff's doctors do not believe that her

---

[11] In addition, the record reflects that Plaintiff also sought out medical experts in peritoneal mesothelioma. In this regard, Defendants point to an October 4, 2010 e-mail from Plaintiff's aunt to Plaintiff, sending Plaintiff a list of peritoneal mesothelioma specialists including Dr. Levine. (E-mail dated October 14, 2010 [Doc. #476-9].) In the e-mail, Plaintiff's aunt notes that this is a "list compiled by National Institutes of Health and the National Cancer Institute – top peritoneal meso docs in the nation – sent to me by asbestos center in florida." (E-mail dated October 14, 2010 [Doc. #476-9].) Thus, by 2010, Plaintiff was sufficiently on notice of the link between her disease and asbestos to seek out specialists in peritoneal mesothelioma compiled by an "asbestos center" in Florida.

[12] Plaintiff's Brief asserts that Plaintiff's treating physicians repeatedly advised her that her mesothelioma was not caused by asbestos. (Pl. Resp. [Doc. #518] at 2, 14, 18.) However, the record actually reflects that Plaintiff does not recall ever discussing asbestos with her treating physicians. (J. Ratcliff Dep. Dec. 13, 2016 at 32, 35-36, 157-159, 161, 164, 197-198; Dec. 14, 2016 at 288; Feb. 15, 2017 at 326-328; Feb. 14, 2017 at 237; Sept. 20, 2018 at 169 [Doc. #476-3 at 11, 12, 42-44, 52-53, 77, 244, 311, 357].)

disease was caused by asbestos exposure, in 2005 or now, does not mean that the statute of limitations has not begun to run. Similarly, Plaintiff contends that it is unreasonable to find that she should have been on notice of the link to asbestos, given that Defendant's experts opine that Plaintiff's mesothelioma was not caused by asbestos exposure. However, the statute of limitations is not stayed until all experts agree on causation, or until causation can be proved to unanimous certainty. The fact that Defendants dispute that Plaintiff's condition was caused by asbestos exposure does not preclude the statute of limitations from running. Indeed, it appears that under Plaintiff's view, the statute of limitations has still not begun to run, and would not run until there was no dispute regarding the causation of her disease.

The Court also notes that Plaintiff's expert Dr. Bedrossian does not provide any support for her statute of limitation contentions. Plaintiff herself states that Dr. Bedrossian's opinions are "unrelated to Plaintiff's knowledge of her diagnoses, its relationship with asbestos, or notice of a potential claim against Defendants prior to filing the within action." (Pl. Br. at 8 [Doc. #518].) Nevertheless, it is notable that Dr. Bedrossian opines that Plaintiff's WDPM was caused by her exposure to asbestos, and Dr. Bedrossian explained that Plaintiff's WDPM and epithelioid mesothelioma were "the same lesion," caused by asbestos exposure. (Bedrossian Report at 17 [Doc. #476-8 at 18]; Bedrossian Dep. March 6, 2019 at 33 [Doc. #476-4 at 10].) As such, Plaintiff is not arguing that only her epithelioid mesothelioma was caused by asbestos exposure, or that her WDPM was not caused by or linked to asbestos

exposure.[13]   Thus, her theory of causation is the same as to both WDPM and epithelioid mesothelioma.

Ultimately, Plaintiff has not presented any evidence to create a genuine issue of material fact that would affect the statute of limitations determination, and there is no basis on which a reasonable jury could conclude that her claim did not accrue until after March 1, 2014.

D.    Washington Case

Finally, Plaintiff contends that in her prior state case, which she filed in Washington State and then voluntarily dismissed, the court found that there were genuine issues of material fact precluding summary judgment on the statute of limitations defense.   However, this contention does not fairly convey the status of the state court's determination at the time of Plaintiff's voluntary dismissal.

In support of her contention, Plaintiff offers a partial transcript of an August 18, 2017, hearing on motions for summary judgment in her Washington State case (see Transcript [Doc. #518-25]), where the judge stated that the medical record was "ambiguous" as to whether there was an association between WDPM and asbestos, thus potentially creating an issue of fact on whether a reasonable person would have been on notice to suspect a wrongful cause. (Pl. Resp. [Doc. #518] at 14).   However, review of that statement in context reflects that when the court made that statement, its understanding was that Ms. Ratcliff's argument was that

---

[13] With respect to causation, Dr. Bedrossian opines that "WDPM appears to belong squarely in the category of asbestos-induced neoplastic proliferations, occupying a less aggressive position spectrum of malignancy than a fully developed malignant mesothelioma," and "Ms. Ratcliff developed WDPM and epithelioid malignant mesothelioma from the inhalation of asbestos." (Bedrossian Report at 15, 17 [Doc. #476-8 at 16, 18].)   As noted above, Defendants have filed Daubert motions seeking to exclude Dr. Bedrossian's opinions on causation.   The Court need not resolve those issues because even if Dr. Bedrossian's opinions are considered, Plaintiff's claims are barred by the statute of limitations.

WDPM and malignant mesothelioma were separate and distinct diseases, and that WDPM was not caused by asbestos but malignant mesothelioma was a separate disease caused by asbestos and not diagnosed in Plaintiff until 2014. Notably, at a later February 8, 2018, summary judgment motion hearing, after receiving clarification that Ms. Ratcliff was arguing that her WDPM <u>was</u> caused by asbestos, the judge stated that Plaintiff's new position on causation supported the defendant's motion for summary judgment on statute of limitations grounds. (Washington State Ct. Sum. J. Hr'g Tr. at 58-61 [Doc. #476-11 at 60-63]). Specifically, the judge stated:

> Well, you're making my job very easy because I'm going to grant defendant's motion on summary judgment on statute of limitations . . . . I mean, we have to be consistent here, Counsel, and you walked into my courtroom seven months ago and said, "WDPM is not related to asbestos. There's no way that she could have known that WDPM was asbestos related. She developed something which was later asbestos related." And now you're telling me something different and I'm – you know, I've done a lot of reading, but I'm happy to grant the defendants' motion on summary – on statute of limitations at this time.

(<u>Id.</u>) Thus, at the hearing in February 2018, the court clarified that given Plaintiff's position that her WDPM was caused by asbestos exposure, the three-year statute of limitations had run. (<u>Id.</u>) Plaintiff took a voluntary dismissal in that case before any further order was entered. Therefore, Plaintiff's citation to the Washington State case actually supports Defendants' position that the statute of limitations bars Plaintiff's claims.

IV.    <u>CONCLUSION</u>

IT IS THEREFORE RECOMMENDED that Defendants' Statute of Limitations Motion for Summary Judgment [Doc. #475] be GRANTED and Honeywell's Motion for

Summary Judgment Pursuant to Fed. R. Civ. P. 56 [Doc. #468] be GRANTED as it relates to Defendant's statute of limitations defense.

IT IS FURTHER RECOMMENDED that Defendant Ford's <u>Daubert</u> Motions to Exclude the expert opinion testimony of Dr. David Rosner, Dr. Carlos Bedrossian, and Dr. Arnold Brody and Motion for Summary Judgment pursuant to Rule 56 [Doc. #461, #467, and #471]; Defendant Honeywell's <u>Daubert</u> Motion to Exclude the expert opinion testimony of Dr. Carlos Bedrossian [Doc. #463]; Defendant WCD's <u>Daubert</u> Motions to Exclude Specific Causation Opinions and Cumulative Exposure Opinion as Evidence of Causation and Motion for Summary Judgment [Doc. #465, #472, and #477]; and Defendant BSI's Motion for Partial Summary Judgment and Motion to Bifurcate [Doc. #486 and #491] be TERMINATED as MOOT.

This, the 27th day of September, 2019.

    /s/ Joi Elizabeth Peake    
United States Magistrate Judge
